**RELIANCE STEEL & ALUMINUM CO. and Samuel Alvarado, Petitioners**

**v.**

**Michael SEVCIK and Cathy Loth, Respondents.**

No. 06–0422.

Supreme Court of Texas.

Argued Dec. 4, 2007.

Decided Sept. 26, 2008.

Chad Michael Forbes, Thomas C. Wright, Wright Brown & Close, LLP, Houston TX, Russell H. McMains, Law Offices of Russell H. McMains, Corpus Christi, TX, for Reliance Steel & Aluminum Co. and Samuel Alvarado.

David W. Holman, The Holman Law Firm, P.C., Houston TX, Macklin Keith Johnson, Hallettsville, TX, for Michael Sevcik and Cathy Loth.

Justice BRISTER delivered the opinion of the Court.

Neither a plaintiff's poverty nor a defendant's wealth can help a jury decide whose negligence caused an accident.[1] Even though punitive damages were not at

---

1. *See Texas Co. v. Gibson*, 131 Tex. 598, 116 S.W.2d 686, 687 (1938) (holding trial court erred in allowing plaintiffs to argue that defendant company had "all the money behind them, and because they are one of the biggest corporations in the country") (internal quotation marks omitted); *Texas & Pac. Ry. Co. v. Harrington*, 62 Tex. 597, 601 (1884) (holding trial court erred in allowing plaintiff's widow to testify "that she was very poor, that they had no means of support except the labor of her husband, and that she had no means of supporting or educating her children") (internal quotation marks omitted).

issue in this collision case, the plaintiffs tendered evidence that the defendant's annual revenues were $1.9 billion. Because this evidence was inadmissible, and the record reflects that it probably caused an improper verdict, we reverse and remand for a new trial.

## I. Background

Michael Sevcik and Cathy Loth were injured in a highway accident west of Houston when they were hit from behind by a tractor trailer owned by Reliance Steel & Aluminum Co. and driven by Sam Alvarado. Sevcik and Loth filed suit in Waller County, and at trial they offered the following testimony from the deposition of Reliance's corporate representative:

Q: How big a company is Reliance?

A: I believe last year's annual sales approximated $1.9 billion.

Q: About how many employees do they have? Do you know?

A: Just guessing, I think we're close to 3,000 I think, nationwide.

Q: And are the headquarters for Reliance in California? Is that what I—

A: Yes, sir. They're in Los Angeles, California.

Outside the presence of the jury, counsel for the defendants objected to the offer:

Defense counsel: Judge, on this and the next couple pages, [plaintiffs' counsel] is talking to the witness—this is the corporate rep for Reliance Steel & Aluminum. He is talking to him about how big a company it is, how many people do you employ, you're all over the country. And I think that is irrelevant and it is also inflammatory to the jury because that plants a seed in their mind that this is a huge company with huge dollars and they can afford a huge verdict.

The Court: [to plaintiff's counsel] You are not seeking punitives?

Plaintiffs' counsel: No, sir.

The Court: Therefore it becomes less relevant.

Plaintiffs' counsel: Right. The thing is, we are definitely entitled to show they are not a mom and pop operation, and we are going to talk—It says they are a California corporation. Then he says they are a division. I'm entitled to bring all of that in.

Defense counsel: I don't think it is relevant at all. We have the truck driver here, the man who drove the truck who was involved in the accident. Why do we need all this information about the company? That only plants the seed in their mind—

Plaintiffs' counsel: He is asking Mike Sevcik if he bought a new truck. I think everything

Defense counsel: This, I think, only tends to make the jurors start thinking about how much money is behind Mr. Alvarado, which isn't something they need to reach their verdict

Plaintiffs' counsel: Your Honor, some of what we get into in his deposition and then in the testimony of the driver is—part of it is how much—how many hours they have these people riding on the road, 15- and 16-hour days.

The Court: I'm going to overrule the objection

At the end of the four-day trial, the jury awarded the plaintiffs more than $3 million. The defendants appealed, challenging several of the damage awards and the admission of evidence of its $1.9 billion in revenues. After transfer for docket equalization, the court of appeals reduced one damage item by $6,000, affirmed the rest, and held admission of the gross sales evi-

dence was harmless.[2] The defendants then petitioned this Court for review.

## II. Evidence of Wealth

Even when a party's wealth has no logical relevance to a case, the prejudicial effect of such evidence often creates strong temptations to use it. As we have stated before, "highlighting the relative wealth of a defendant has a very real potential for prejudicing the jury's determination of other disputed issues in a tort case."[3] To avoid such situations, Texas courts "historically have been extremely cautious in admitting evidence of a party's wealth."[4] Even when wealth can be used on the issue of punitive damages, we take the unusual step of bifurcating a trial so that it cannot be used for any other purpose.[5]

In this case, plaintiffs' counsel argued the evidence of gross revenues was admissible to show Reliance was "not a mom and pop operation." Yet Reliance had never suggested to the jury that it was "a mom and pop operation" or could only pay a limited judgment;[6] the plaintiffs' effort to prove otherwise was simply an unsolicited attempt to show Reliance made a lot of money.

Plaintiffs' counsel argued that gross revenues were relevant to show Reliance was negligent in "running its drivers into the ground" even though it was big enough to "place more drivers on the road or have them work fewer hours." But the plaintiffs never pleaded such a theory; their Third Amended Petition alleged only a vicarious liability claim against Reliance for the negligent acts of its driver. Nor was such a claim necessary; if an employee drives when he is too tired, his employer is liable regardless of the reason for his condition.[7]

But even if the plaintiffs had alleged or needed to prove that Reliance was independently negligent, for several reasons its gross sales had no tendency to make that claim more or less probable.[8] In the first place, the premise behind this argument is faulty because big companies cannot afford to be less efficient than small companies, at least not for long. Second, the negligence standard is an objective one; it does not generally allow smaller companies to do what bigger companies cannot. Third, a company with large revenues may still not be able to afford more drivers doing less work, because "gross

2. 268 S.W.3d 65, 2006 WL 563044.

3. *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 30 (Tex.1994) (punctuation omitted).

4. *Sw. Elec. Power Co. v. Burlington No. R.R. Co.,* 966 S.W.2d 467, 471 (Tex.1998); *see also Eckman v. Centennial Sav. Bank,* 784 S.W.2d 672, 675 (Tex.1990); *Texas Co.,* 116 S.W.2d at 687; *cf. Birchfield v. Texarkana Mem'l Hosp.,* 747 S.W.2d 361, 366 (Tex.1987) (holding hospital's finances admissible on issue of gross negligence).

5. TEX. CIV. PRAC. & REM.CODE §§ 41.009, 41.011(b).

6. *Cf. Hall v. Birchfield,* 718 S.W.2d 313, 326 (Tex.App.-Texarkana 1986), *rev'd on other*

grounds, *Birchfield v. Texarkana Mem'l Hosp.,* 747 S.W.2d 361 (Tex.1987) (holding hospital's finances admissible after administrator injected issue by testifying it could not afford additional equipment or personnel training).

7. Although Reliance did not stipulate that Alvarado was in the course and scope of his employment until shortly before closing arguments, contemporaneous trip records and other discovery disclosures unquestionably established that fact long before the trial began.

8. *See* TEX.R. EVID. 401 (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").

sales are only remotely related to its wealth until the company's expenses are subtracted."[9] Fourth, if a defendant's wealth is admissible to show that it could afford to avoid an accident, then wealth will be admissible in virtually every case, and there would be nothing left of the traditional rule to the contrary.

■ We also reject the suggestion that evidence of Reliance's wealth was admissible because the defendants' attorneys asked several inappropriate questions about the size and newness of the plaintiffs' cars or home. Each time this occurred and an objection was made, the trial court sustained the objection and excluded the evidence. One party cannot violate the rules of evidence just because the other party tried to do the same, especially if the other party's evidence was excluded.

The plaintiffs here were entitled to argue (and did) that Alvarado's hours were "too long," but it was not Reliance's gross revenues that made them so. The plaintiffs offered no evidence that Reliance pushed its drivers harder than its competitors, or harder than regulations allowed. Reliance is not complaining about evidence that it had a lot of drivers; it only complains about evidence that it had a lot of money. We hold the trial court abused its discretion in allowing admission of Reliance's gross annual sales.[10]

## III. Harmless Error?

■ Erroneous admission of evidence is harmless unless the error probably (though not necessarily) caused rendition of an improper judgment.[11] We have recognized "the impossibility of prescribing a specific test" for harmless-error review,[12] as the standard "is more a matter of judgment than precise measurement."[13] A reviewing court must evaluate the whole case from voir dire to closing argument, considering the "state of the evidence, the strength and weakness of the case, and the verdict."[14]

### A. The Effect

The starting point for harmless-error review is the judgment. Obviously, a party that wins a favorable judgment has usually not suffered harm from any errors during trial. In this case, several parts of the verdict on which the judgment was based show that something beyond the relevant evidence was guiding the jury's deliberations.[15]

■ During trial, plaintiffs' counsel introduced a chart showing that Loth's past medical expenses totaled $33,985.23, and he asked for precisely that amount in closing argument. Nevertheless the jury awarded $40,000. As the court of appeals held, there was no evidence for this

9. *Wal–Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 331 (Tex.1993) (Gonzalez, J., concurring).

10. *See In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005) (holding admission or exclusion of evidence is reviewed for abuse of discretion).

11. Tex.R.App. P. 44.1; *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex.2004).

12. *McCraw v. Maris*, 828 S.W.2d 756, 757 (Tex.1992) (quoting *Lorusso v. Members Mut. Ins. Co.*, 603 S.W.2d 818, 821 (Tex.1980)).

13. *Nissan Motor Co.*, 145 S.W.3d at 144.

14. *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 841 (Tex.1979); *accord, Texas Dept. of Human Servs. v. White*, 817 S.W.2d 62, 63 (Tex.1991).

15. *See Coastal Oil & Gas Corp. v. Garza Energy Trust*, 268 S.W.3d 1, 2008 WL 3991029 (Tex.2008) (holding damage amounts clearly beyond relevant evidence showed admission of prejudicial memo was harmful).

amount as "the record is devoid of any testimony or affidavits" supporting it.[16]

The same is true of the jury's verdict that Loth's future medical expenses were $250,000. Reliance concedes there was some evidence that she would incur $37,000 for future medications, and there was also some evidence she could incur as much as $90,000 for a six-month rehabilitation program in Houston.[17] But there was no evidence she would incur anything more. To the contrary, her expert testified that "when we see a patient like Cathy, who is several years past their brain injury, all of the healing and recovery that is going to take place has taken place." While there was evidence that Loth would suffer permanent brain damage (for which the jury awarded $1.75 million in future impairment and mental anguish), there was no evidence that further medical treatment could do anything about it. The jury's finding on future medical expenses was simply twice as much as the evidence would support.

The jury's finding of $750,000 for future earning capacity was also surprisingly large given the evidence. Loth's tax returns leading up to the accident showed a total income of $7,562 for all five years combined;[18] at that rate, the future award represented almost 500 years. Similarly, the jury's award for her earning capacity lost in the three years *before* trial was

$15,000; at that rate the future award represented 150 years. It is of course true that Loth was entitled to damages for future earning *capacity*, not just future earnings.[19] But the jury's findings still must be based on "such facts as are available" and "on something more than mere conjecture." [20] We need not decide whether this particular award was erroneous; we conclude only that in combination with the other awards it shows that the jury's findings probably were the result of something other than the admissible evidence in the case.[21]

The plaintiffs argue that the verdict was not inflated because the jury awarded them only half of what they requested in closing argument. But whether a jury awarded less than the plaintiffs requested is not the same question as whether they awarded the plaintiffs more than the evidence supported. The primary damage requests rejected by the jury related to future pain and mental anguish and future physical impairment, matters as to which the lack of specific proof available makes it very hard to say whether the jury's award was either "too low" or "too high." But in those parts of the verdict where such evidence was available, the jurors' findings generally exceeded it by a substantial amount.

---

16. 268 S.W.3d 65.

17. The cost of this program was $3,000 per week for 26 weeks, plus up to $2,000 monthly to rent an apartment for six-months in Houston. We assume without deciding that apartment rental is a proper element of "medical care."

18. The tax returns reported income of $4,945 in 1995, $1,224 in 1996, $216 in 1997, $718 in 1998, and $459 in 1999.

19. *McIver v. Gloria*, 140 Tex. 566, 169 S.W.2d 710, 713 (1943) ("The fact that plaintiff was

not engaged in farming at the time he was injured does not bar his recovery for loss of earning capacity, because the measure of his loss is his capacity to earn, not his actual earnings.").

20. *Id.* at 712.

21. *See Coastal Oil & Gas Corp. v. Garza Energy Trust*, 268 S.W.3d 1, 2008 WL 3991029 (Tex.2008) (holding damage amounts clearly beyond relevant evidence showed admission of prejudicial memo was harmful).

## B. The Evidence

In reviewing whether erroneous admission of evidence was harmful, we have also looked to the role the evidence played in the context of the trial. Thus, if erroneously admitted or excluded evidence was crucial to a key issue, the error was likely harmful.[22] By contrast, admission or exclusion is likely harmless if the evidence was cumulative,[23] or if the rest of the evidence was so one-sided that the error likely made no difference.[24]

As already noted, a defendant's wealth has "a very real potential" for prejudice.[25] The Legislature has deemed it so potentially prejudicial that it must be separated from the jury's deliberations regarding liability and actual damages.[26] That concern is especially relevant here because the more impressive the wealth, the more likely it is to make an impression. Had Reliance's gross sales been $190,000 or perhaps even $1.9 million, the plaintiffs might be right that it would have been unlikely to turn jurors' heads. But sales of $1.9 *billion* are surely enough to catch any juror's attention. If evidence of gross sales is ever likely to be harmful, the evidence offered here surely must qualify.

Further, that evidence must be considered in the context of this case. Liability here was largely uncontested; as plaintiffs' counsel told the jury in his opening statement, "You're going to hear the driver tell you that it was his fault." Instead, he correctly noted that the key issue was damages: "The biggest issue, the biggest issue, in my opinion, that you're going to have at the end of the week or later in the week when you deliberate is going to involve how much should be paid." In that respect, most of the damages here were difficult to gauge, stemming as they did from soft-tissue injuries and impairments whose effects were hard to measure objectively. Given that the trial focused primarily on setting damage amounts as to which jurors have few clear guideposts, it is probable that proof of Reliance's huge revenues played a crucial role on the key issue at trial.

## C. The Emphasis

In harmless-error review, we have also looked to efforts by counsel to emphasize the erroneous evidence.[27] In this case, the court of appeals held that evidence of Reliance's wealth was harmless because it was mentioned only once.[28] If that were the only rule, there would be little use for the

---

**22.** See *Alvarado v. Farah Mfg. Co.*, 830 S.W.2d 911, 917 (Tex.1992) (holding erroneous admission of another employee's testimony was harmful as it was sole evidence of a pattern of retaliation); *McCraw v. Maris*, 828 S.W.2d 756, 758 (Tex.1992) (holding exclusion of "crucial circumstantial evidence" regarding whether beneficiary designation form was signed was harmful).

**23.** See *State Farm Lloyds v. Nicolau*, 951 S.W.2d 444, 452–53 (Tex.1997) (holding exclusion of newly discovered evidence harmless as it supported verdict jury reached without it); *Mentis v. Barnard*, 870 S.W.2d 14, 16 (Tex.1994) (holding exclusion of expert testimony was harmful as it was "noncumulative" and "controlling, though not conclusive").

**24.** See, e.g., *Texas Dept. of Human Servs. v. White*, 817 S.W.2d 62, 63 (Tex.1991) (holding admission of photo of child with foster family was harmless in termination trial due to other evidence including mother's substance abuse, emotional illness, and dysfunctional ability as parent).

**25.** *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 30 (Tex.1994) (punctuation omitted).

**26.** TEX. CIV. PRAC. & REM.CODE §§ 41.009, 41.011(b).

**27.** *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex.2004).

**28.** 268 S.W.3d 65.

rules of evidence as everyone could ignore them once with impunity.

Moreover, this argument conflicts with the plaintiffs' additional argument that evidence of Reliance's wealth was "buried in the larger context of testimony that concerned the size of the Reliance Steel operation, the number of employees, the number of divisions, and so forth." While plaintiffs' counsel mentioned the gross revenues figures only once, he mentioned Reliance's large size from voir dire to closing argument:

> [opening statement] Also, Mr. Alvarado was introduced. He is one of the defendants in this case. He works for Reliance Steel. It's a corporation that he works with. They are a California corporation and a Texas corporation, but they have businesses also around Texas. They have some up in Garland, and they have others around the country.
>
> [closing argument] They don't even care what happens out on the highway with their 18-wheelers. Have you seen anybody here from Reliance Steel Corporation? Three thousand employees around the country. No. No. They don't care what happens.

Just like gross sales, the size of Reliance and the number of its employees or divisions had no apparent relation to this traffic accident other than to suggest that it could pay a big judgment. Evidence of Reliance's wealth was not rendered harmless merely because it was emphasized in surrogate forms.

### D. The Effort

■ In harmless-error review, we have also considered whether admission of improper evidence was calculated or inadvertent. As this Court has stated before, a party's insistence on introducing inadmissible testimony "indicates how important he thought it was to his case." [29] In the related area of improper evidence of insurance, Texas courts often look to whether the injection of insurance was inadvertent or not.[30] When attorneys insist that prejudicial evidence be admitted, that can be some evidence that at least they thought it would have some likely effect.

Here, of course, admission was no accident. Proof of Reliance's income was not offered in the heat of the moment, but as a deposition excerpt prepared in advance and offered outside the presence of the jury, giving the plaintiffs time to overcome the defendants' objection and the trial court's reservations.

Intentionally leading the trial court into error does not always make the error harmful. But when issues like race, reli-

---

29. *Alvarado v. Farah Mfg. Co., Inc.*, 830 S.W.2d 911, 917 (Tex.1992).

30. *See, e.g., St. Louis Sw. Ry. Co. v. Gregory*, 387 S.W.2d 27, 33 (Tex.1965) (holding counsel's statement that there was "no insurance here" in response to juror's comment about serving on a previous insurance case was harmless); *Putman v. Lazarus*, 156 Tex. 154, 293 S.W.2d 493, 495 (1956) (holding jurors unsolicited discussion of insurance during deliberations did not require reversal); *Lewis v. UPS, Inc.*, 175 S.W.3d 811, 817 (Tex.App.-Houston [1st Dist.] 2004, pet. denied) (holding witness's unsolicited mention of workers compensation insurance was harmless); *Isern v. Watson*, 942 S.W.2d 186, 198 (Tex.App.-Beaumont 1997, pet. denied) (holding mention of insurance harmless as it was used in argument merely as an analogy to suggest people should be careful); *Kenneth H. Hughes Interests, Inc. v. Westrup*, 879 S.W.2d 229, 238 (Tex.App.-Houston [1st Dist.] 1994, writ denied) (holding witness's unsolicited mention of insurance was harmless); *Beall v. Ditmore*, 867 S.W.2d 791, 795–96 (Tex.App.-El Paso 1993, writ denied) (same); *Univ. of Texas at Austin v. Hinton*, 822 S.W.2d 197, 201 (Tex. App.-Austin 1991, no writ) (holding counsel's response to juror's question in voir dire about plaintiff's insurance coverage was harmless).

gion, gender, and wealth are injected into a case unnecessarily, there is the potential for damage not just to a litigant but to the civil justice system.[31] Courts must provide equal justice to all, regardless of their circumstances, and efforts to suggest that jurors should do otherwise cannot be lightly disregarded.[32]

\* \* \*

We recognize that evidence of a party's wealth is sometimes admissible, and sometimes unavoidable; a large company may be so well known that jurors need no evidence about its ability to pay a judgment. But we also recognize "the potential that juries will use their verdicts to express biases against big businesses, particularly those without strong local presences."[33] We reiterate today that gratuitous evidence about either party's financial circumstances is not what trials should be about.

Accordingly, we reverse the judgment of the court of appeals, and remand the case for a new trial.

---

**31.** *See* 22 C. Wright & K. Graham, Federal Practice and Procedure, Ch. 5 Relevancy and Its Limits, § 5179—Suspect Classifications—Race, Religion, Sex, and Wealth, pp. 163–64 (1st ed.1978) ("[T]he party who asserts a major premise base on one of the suspect classifications must expect that his premise will be more rigorously scrutinized than is typical in rulings on relevance. Trial judges can expect must less leeway in appellate review of relevance rulings that involve such classifications.").

**32.** *See Standard Fire Ins. Co. v. Reese,* 584 S.W.2d 835, 840 (Tex.1979) ("[A]n affront to the court and the equality which it must portray will be dealt with harshly.").

**33.** *See State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 417, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (quoting *Honda Motor Co. v. Oberg,* 512 U.S. 415, 432, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994)) (internal quotation marks omitted).