# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00141-CV

**Appellants, Richard Louis Simmons and Lindig Construction and Trucking, Inc.// Cross-Appellants, Edmond L. Bisland III and Rhonda Bisland**

**v.**

**Appellees, Edmond L. Bisland III and Rhonda Bisland// Cross-Appellees, Richard Louis Simmons and Lindig Construction and Trucking, Inc.**

## FROM THE DISTRICT COURT OF HAYS COUNTY, 207TH JUDICIAL DISTRICT NO. 05-0879, HONORABLE WILLIAM HENRY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Richard Louis Simmons and his employer, Lindig Construction and Trucking, Inc., appeal from the trial court's judgment affirming a jury verdict in favor of Edmond and Rhonda Bisland in the Bislands' suit for damages resulting from a motor vehicle accident. Simmons and Lindig argue that the trial court erred in allowing the Bislands to present evidence supporting their alternative liability theories after Simmons and Lindig stipulated to negligence, causation, and vicarious liability. Simmons and Lindig further argue that the jury awards for certain elements of damages are unsupported by the evidence. The Bislands cross-appeal, arguing that the trial court erred in allowing Simmons and Lindig a credit against prejudgment interest. We modify the trial court's judgment to delete the credit against prejudgment interest and affirm the judgment as modified.[1]

---

[1] Simmons and Lindig's motion for leave to file a post-submission brief is hereby granted.

## BACKGROUND

The accident giving rise to the underlying suit occurred at approximately 4:30 p.m. on December 20, 2004, when Simmons, driving a Lindig-owned 18-wheeler fully loaded with limestone, rear-ended Edmond Bisland's pickup truck. At the time of the collision, Edmond was stopped in the eastbound lane of Highway 21 in Hays County, waiting for oncoming traffic to pass so that he could make a left turn onto Yarrington Road. Simmons, who was traveling east on Highway 21 with his cruise control set at 65 miles per hour, failed to stop and rear-ended Edmond's vehicle.

Witnesses to the accident testified that Edmond's left turning signal had been flashing as he waited to turn left, that it was a clear day with dry road conditions, and that Simmons did not appear to slow down or apply his brakes before the collision. The force of the collision knocked Edmond's vehicle 486 feet down the highway before it came to a stop, and the damage to Lindig's 18-wheeler was so significant that it had to be towed from the scene. One witness testified, "It was a violent collision. I've never seen or witnessed anything as horrific as that. I'm surprised Mr. Bisland is here today."

Edmond's wife, Rhonda Bisland, testified that her husband called her from his cell phone immediately after the accident. Rhonda rushed to the scene, arriving before the emergency vehicles, and found Edmond pinned inside his truck. Edmond was ultimately extracted from his vehicle through the passenger side window and transported to the hospital. He suffered extensive injuries as a result of the accident, including a hangman's fracture of the C-2 vertebra, which his treating physician, Dr. Paul Geibel, described as "the type of fracture seen in a hanging incident."

2

Edmond also suffered a compression fracture of the C-5 vertebra, a right elbow fracture and dislocation which required surgery, a rib fracture, and multiple contusions and abrasions. Due to Edmond's severe spinal injuries, he was forced to undergo a cervical fusion procedure, which required that two cervical discs be removed, bone grafts from his pelvis placed in his spine, a titanium plate and screws attached to his spine, and a halo affixed to his skull, which remained in place for 81 days and prevented him from moving his neck at all. Edmond testified that while the halo was screwed into his skull, he had trouble sleeping and his "head felt like it had glass in it all the time." Rhonda testified that during this period, Edmond "was miserable" and "his head hurt all the time. He said it felt like pieces of glass in his scalp."

Dr. Geibel testified that Edmond would experience permanent limitation of motion as a result of the fused segments of his spine and that he also had the potential to develop "adjacent level degeneration" as a result of the cervical fusion procedure, "meaning he could get problems above or below the fusion where those levels [of Edmond's spine] are now subjected to . . . stresses that normally would have gone through the other two levels." According to Geibel, the potential for adjacent level degeneration created "a high risk" that Edmond would require an additional surgical procedure on his spine in the future. Geibel also stated that Edmond experienced ongoing headaches, chronic neck pain, and spasms that bother him on a daily basis and predicted that Edmond would require $1500 to $2000 worth of doctor's visits, medication, and massage therapy per year in the future.

The Bislands testified extensively regarding the activities that Edmond had previously engaged in regularly but could no longer enjoy as a result of his injuries, including hunting, fishing,

boating, bowling, camping, playing the fiddle, breaking and riding horses, and wrestling with the couple's two young sons. Rhonda explained that the couple had enjoyed attending sporting events before the accident, but that they no longer do so because Edmond cannot sit for long periods of time without suffering from headaches and stiffness in his neck. Rhonda also testified that before the accident, Edmond performed all of the family's household and auto repairs himself, had been remodeling the couple's home in Smithville himself, and frequently assisted her in running an in-home day-care center, but that he can no longer perform these tasks as a result of his injuries. Rhonda further stated that Edmond has experienced continuing pain and headaches, which she believed to be worsening over time, as well as a potentially permanent loss of grip in his right hand as a result of the elbow fracture.

Prior to the accident, Edmond worked for the Texas Department of Transportation (TxDOT) as a heavy equipment operator. Edmond testified that he was one of only five individuals at TxDOT qualified to operate a certain type of hydraulic excavator and that he had taken great pride in his work. His supervisor, Wayne Barrett, testified that he considered Edmond to be a highly skilled, reliable, and dedicated employee. After missing almost a year of work and taking all of his accumulated sick leave, Edmond returned to his employment in November 2005 and discovered that he was unable to operate the equipment as he had in the past, due primarily to the difficulty he experienced getting into and out of the machines. In February 2007, Dr. Geibel placed Edmond on work restrictions, recommending that he not participate in frequent pushing, pulling, or lifting of items weighing over 25 pounds. Geibel also advised Edmond not to operate vibrating equipment for extended periods of time because of the possibility of exacerbating his neck spasms. As a result

4

of these limitations, Edmond could no longer work as a heavy equipment operator and began serving TxDOT in a training capacity. Edmond testified that he lived with constant fear that he would lose his job and his ability to support his family, stating that a training position "runs out after awhile" and that it is difficult for him to train equipment operators because he cannot physically show them how to operate the equipment.

The Bislands filed suit against Simmons and Lindig in May 2005. Simmons and Lindig maintained in their pleadings, including the live pleading at trial, that the accident had been unavoidable and was not the result of Simmons's negligence. In October 2007, less than three weeks before trial and six months after the deadline for amending pleadings, Simmons and Lindig stipulated to negligence and vicarious liability. After a jury trial on the issue of damages, the jury awarded Edmond Bisland $400,000 in past physical pain and mental anguish, $550,000 in future physical pain and mental anguish, $35,000 in past loss of earning capacity, $0 in future loss of earning capacity, $300,000 in past physical impairment, $915,000 in future physical impairment, $65,000 in past medical expenses, and $40,000 in future medical expenses. The jury also awarded Rhonda $25,000 in past loss of household services, $60,000 in future loss of household services, $52,000 in past loss of consortium, and $115,000 in future loss of consortium, bringing the Bislands' total damage award to $2,557,000. The amount awarded by the jury was approximately $1,000,000 less than the total amount of damages requested by the Bislands. The trial court issued judgment on the verdict, awarding prejudgment and postjudgment interest on the award, with a credit against prejudgment interest for the amount of interest accrued during the period in which a settlement offer was outstanding. *See* Tex. Fin. Code Ann. § 304.105(b) (West 2006). This appeal and cross-appeal followed.

5

On appeal, Simmons and Lindig argue (1) that the trial court erred in admitting evidence of the Bislands' alternative liability theories after the stipulation to negligence and vicarious liability and (2) that the jury's awards of certain elements of damages are not supported by the evidence. On cross-appeal, the Bislands argue that the trial court erred in awarding a credit against prejudgment interest for interest accrued during the period that a settlement offer was outstanding.

### STANDARD OF REVIEW

The question of whether to include or exclude evidence is a matter committed to the trial court's discretion. *Volkswagon of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 918 (Tex. 2004). Erroneous admission of evidence requires reversal only if "the error probably (though not necessarily) caused rendition of an improper judgment." *Reliance Steel & Aluminum Co. v. Sevick*, 267 S.W.3d 867, 871 (Tex. 2008); *see also Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004).

To evaluate the legal sufficiency of the evidence to support a finding, we must "determine whether the proffered evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex. 1994). In reviewing a verdict for legal sufficiency, we credit evidence that supports the verdict if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). To evaluate the factual sufficiency of the evidence to support a finding, we consider all of the evidence, setting aside the verdict only if the evidence supporting the jury finding is so weak or so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *See Dow Chem. Co. v. Francis*,

6

46 S.W.3d 237, 242 (Tex. 2001).  We may not substitute our judgment for that of the jury, even if the evidence would clearly support a different result.  *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998).

We review a trial court's award of prejudgment interest under an abuse-of-discretion standard.  *J.C. Penney Life Ins. Co. v. Heinrich*, 32 S.W.3d 280, 289 (Tex. App.—San Antonio 2000, pet. denied).  However, "a trial court has no 'discretion' in determining what the law is or applying the law to the facts."  *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992).

## DISCUSSION

*Admission of Liability Evidence*

Simmons and Lindig argue that, in light of their stipulation to negligence and vicarious liability, the trial court erred in admitting evidence related to the Bislands' alternative liability theories.[2]  The Bislands presented evidence at trial that by violating certain federal safety regulations imposed on motor carriers, Lindig had been negligent in its hiring, retention, supervision, and entrustment of Simmons.  Simmons and Lindig contend that the trial court's admission of this evidence constitutes harmful error because it was inflammatory and inflated the jury's damage awards.  The Bislands contend that Simmons and Lindig failed to properly preserve this issue for appellate review.

---

[2] In the Bislands' second amended petition, their live pleading at trial, they claimed that Lindig was vicariously liable for Edmond's injuries on the basis of respondeat superior, and, in the alternative, that Lindig was liable based on its violations of federal motor carrier safety regulations, its negligent hiring, retention, and supervision of Simmons, and its negligent entrustment of the truck to Simmons.

7

As a general rule, evidence supporting alternative liability theories such as negligent hiring or negligent entrustment is inadmissible when the defendant has stipulated to vicarious liability. *See, e.g.*, *Estate of Arrington v. Fields*, 578 S.W.2d 173, 178 (Tex. Civ. App.—Tyler 1979, writ ref'd n.r.e.); *Patterson v. East Tex. Motor Freight Lines*, 349 S.W.2d 634, 636 (Tex. Civ. App.—Texarkana 1961, writ ref'd n.r.e.) ("The theory of negligent entrustment in order to bind the truck company became immaterial as soon as the stipulation as to course of employment was made.").

However, assuming without deciding that the trial court erred in admitting evidence in support of the Bislands' alternative liability theories and that the error was properly preserved for appellate review, such error is harmless unless it "probably (though not necessarily) caused rendition of an improper judgment." *Reliance Steel*, 267 S.W.3d at 871. The evidence complained of consists of evidence that Lindig failed to comply with certain federal safety regulations by (1) failing to obtain Simmons's signature on his employment application, (2) omitting Lindig's name and address from Simmons's employment application, (3) neglecting to adequately document the reference check that Lindig conducted with Simmons's previous employers, (4) failing to administer the required pre-employment drug test to Simmons until three months after his employment began, (5) briefly allowing Simmons to drive with an expired medical examiner's certificate before it was renewed, and (6) failing to subject Simmons to a post-accident drug or alcohol test within the deadline for post-accident testing.[3] The Bislands' counsel also cross-examined Simmons regarding his

---

[3] Lindig's president, William Lindig, and its safety and personnel director, Kayla Gayle, both testified that Simmons was taken to the office of Dr. Daniel Ramsey for a drug test the day after the accident. Dr. Ramsey's office was unable to locate clinical records confirming that Simmons had been drug tested on that date.

8

employment application with Lindig, pointing out minor inaccuracies with the dates of his past employment and his previous addresses.[4]

In response, Simmons and Lindig presented evidence that Simmons had been randomly drug tested multiple times during his employment with Lindig and had never received a positive result, that his medical examiner's certificate was valid at the time of the accident, that a reference check with Simmons's previous employers had yielded satisfactory results, and that Simmons had a clean driving record at the time of the accident, with no prior wrecks or tickets. Furthermore, while the Bislands' counsel characterized the circumstances surrounding post-accident drug testing as a "cover-up" during opening argument, no evidence was presented that drugs or alcohol were involved in the accident. In addition, the report resulting from the Texas Department of Public Safety's investigation of the accident, which was entered into evidence, indicated that the only factor or condition contributing to the accident was Simmons's failure to control his speed. Noticeably absent from the report was any indication that the investigator believed Simmons was under the influence of drugs or alcohol at the time of the accident. Lindig's president, William Lindig, read from the DPS report during his testimony and stated, in response to questioning, that the influence of alcohol was not listed on the report as a factor leading to the accident. William Lindig further testified that he allowed Simmons to drive a company vehicle home after the accident.

---

[4] The Bislands also presented evidence that Simmons was later fired from Lindig after another accident in which Lindig's president determined that Simmons had fallen asleep at the wheel. Simmons and Lindig did not object to this testimony at trial and therefore did not preserve error regarding its admission. *See* Tex. R. App. P. 33.1. Simmons's post-accident medical records, which indicated a possibility that he suffers from sleep apnea, were also entered into evidence without objection.

Viewing the totality of the evidence presented to the jury, including the severity of Edmond's injuries, the hardship inflicted on his wife as a result of his injuries, and the eye-witness testimony regarding the horrific nature of the accident, we cannot conclude that the complained-of evidence, consisting primarily of complaints about employment paperwork, most of which had been remedied long before the accident occurred and none of which had any causal connection to the accident, probably caused the rendition of an improper damage award in this case. While Simmons and Lindig cite *Reliance Steel*, 267 S.W.3d 867, to support their contention that the alternative liability evidence caused the jury to inflate the damage awards, we find *Reliance Steel* to be distinguishable in that it involved evidence of the defendant-employer's wealth, rather than evidence that the defendant-employer had, for example, failed to obtain a driver's signature on his employment application several years before any accident occurred. *See* 267 S.W.3d at 870. Texas courts have long recognized the particularly prejudicial nature of evidence of a party's wealth. *See, e.g.*, *Southwestern Elec. Power Co. v. Burlington N. R.R. Co.*, 966 S.W.2d 467, 471 (Tex. 1998); *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 30 (Tex. 1994). Given the relative insignificance of the evidence that Lindig had inadvertently violated federal regulations in its employment procedures when compared to the substantial evidence of the severity of Edmond's injuries and the permanent and detrimental impact of these injuries on the Bislands' lives, we hold that if the trial court did in fact err in admitting evidence of Lindig's federal regulatory violations, any such error was harmless. *See Reliance Steel*, 267 S.W.3d at 871 ("Erroneous admission of evidence is harmless unless the error probably (though not necessarily) caused rendition of an improper judgment."). Simmons and Lindig's first issue is overruled.

*Sufficiency of the Evidence*

In their second issue on appeal, Simmons and Lindig raise a number of arguments regarding the sufficiency of the evidence to support certain elements of damages awarded by the jury, asserting (1) that the award of future medical expenses is improper because it represents an award for surgery on a preexisting condition, (2) that the jury improperly considered a preexisting degenerative disc condition in awarding damages, (3) that the ratio of non-economic to economic damages in this case is excessive, (4) that the mental anguish award is unsupported by the evidence, and (5) that the past physical impairment and loss of consortium awards are excessive because they exceed the amounts requested by the Bislands. We will address each of these arguments in turn.

First, Simmons and Lindig argue that the evidence is insufficient to support the award of $40,000 for future medical expenses because the jury awarded this amount for surgery on a preexisting disc condition. Dr. Geibel, Edmond's treating physician, testified that a disc in Edmond's spine showed a problematic level of herniation or deterioration, but stated that he could not confirm whether this abnormality existed prior to the accident.[5] Geibel further testified that the disc in question was more likely than not subject to "an increased rate of deterioration due to the fusion" procedure Edmond had undergone as a result of the injuries he sustained in the accident. Geibel explained that Edmond was at risk of needing additional surgery as a result of the fusion procedure, and that this risk was heightened because of his deteriorated disc.[6]

---

[5] When asked, "Do you know whether or not the disc that's showing problems now was injured in this accident?" Geibel replied, "No, I don't know all of that. I don't have those records or MRIs that—that preceded this."

[6] Geibel testified, "[A] normal person with normal discs would have an increased risk [of future surgery] because of the fusion, period. A person with a fusion and an abnormal disc is going

11

In response, Simmons and Lindig presented the testimony of Dr. Nicholas Tsourmas, who reviewed Edmond's medical records from February 2005, two months after the accident, and stated that the degenerative disc condition "has to be preexisting" and that it "cannot be caused by the accident" because such degeneration could not have occurred in such a short amount of time.[7] Tsourmas further testified that he did not believe Edmond would need future surgery.

Regardless of whether Edmond's disc deterioration predated the accident or the probability of his need for future surgery, the evidence presented at trial in connection with Edmond's future medical expenses was not limited to surgical expenses. Rather, the Bislands presented evidence, through the testimony of Edmond's treating physician, that they would incur a total of $94,250 in future medical expenses—$54,250 for necessary doctor visits, medication, and massage therapy, and an additional $40,000 in the event a future surgery was needed.[8] Simmons and Lindig do not argue that the evidence is insufficient to support at least $40,000 in future non-surgical costs, including doctor visits, medication, and massage therapy. In light of this evidence, we will not disturb the jury's award of $40,000 in future medical expenses. *See Antonov v. Walters*, 168 S.W.3d 901, 908 (Tex. App.—Fort Worth 2005, pet. denied) ("An award of future medical

to be at a very heightened and problematic—increased rate for additional problems." Geibel stated that this combination of the fusion procedure and Edmond's disc deterioration resulted in a greater than 50% risk that he would need future surgery.

[7] The February 2005 medical records noted "mild, broad annular bulging without significant mass effect" in the disc in question. On cross-examination, Tsourmas conceded that he had not reviewed the MRI taken on the date of the accident, nor had he reviewed any MRIs taken before the accident.

[8] In calculating the total cost of future doctor visits, medication, and massage therapy, the Bislands relied on an estimated cost of $1750 per year, reflecting the midpoint of Geibel's estimation that these future yearly expenses would be between $1500 and $2000.

expenses lies largely within the jury's discretion. Because issues such as life expectancy, medical advances, and the future costs of products and services are, by their very nature, uncertain, appellate courts are particularly reluctant to disturb a jury's award of these damages.").

Lindig and Simmons also argue that the damages awarded to the Bislands for physical pain and mental anguish, physical impairment, and loss of consortium are excessive because they represent compensation for Edmond's preexisting degenerative disc condition. As previously discussed, the jury was not presented with clear evidence indicating that a degenerative disc condition actually existed at the time of the accident. Geibel, Edmond's treating physician, testified that he did not know whether Edmond's degenerative disc was a preexisting condition, while Tsourmas—Simmons and Lindig's expert—testified that he believed the degenerative disc predated the accident, but acknowledged on cross-examination that he had not reviewed Edmond's MRI from the date of the accident or any MRI taken prior to the accident. The Bislands' counsel also elicited testimony from Tsourmas that he had never served as lead surgeon on the type of surgery performed on Edmond and that he served as a hired expert witness on approximately three to four new cases each month. In its role as factfinder, the jury was free to disregard Tsourmas's testimony. *See, e.g.*, *Weeks Marine, Inc. v. Salinas*, 225 S.W.3d 311, 320 (Tex. App.—San Antonio 2007, pet. dism'd) (stating that "jury is entitled to disbelieve or discount any part of an expert's testimony" and to "make credibility determinations and weigh competing expert testimony and the variables and assumptions upon which that testimony is based"). The jury also heard both Rhonda and Edmond testify extensively regarding the physical activities, including sports and outdoor recreational activities, that Edmond had previously enjoyed but could no longer engage in after the accident

13

because of pain and limitations in his range of motion. Neither of the Bislands gave any indication that Edmond had experienced any pain, physical impairment, or difficulty participating in these activities prior to the accident. Finally, even if the jury did believe Tsourmas's testimony that Edmond had a preexisting degenerative disc condition, there is no indication that the jury improperly considered this condition in awarding damages for physical pain and mental anguish, physical impairment, or loss of consortium. The jury was specifically instructed to award only the amount of money necessary to fairly and reasonably compensate Edmond for damages "that resulted from the occurrence or injury in question" and to fairly compensate Rhonda for injuries "that resulted from the occurrence in question." Absent evidence to the contrary, we must assume that the jury followed these instructions. *Turner, Collie & Braden, Inc. v. Brookhollow, Inc.*, 642 S.W.2d 160, 167 (Tex. 1982); *see also Pipgras v. Hart*, 832 S.W.2d 360, 366 (Tex. App.—Fort Worth 1992, writ denied) ("The mere fact that the jury's award was large does not indicate passion, prejudice, sympathy, or other circumstances not in evidence.").

Simmons and Lindig further argue that the damage awards for physical pain, mental anguish, and physical impairment are excessive in comparison to the amounts awarded for loss of earning capacity and medical expenses, citing *Houston Livestock Show & Rodeo, Inc. v. Hamrick*, 125 S.W.3d 555, 581 n.25 (Tex. App.—Austin 2003, no pet.) ("Courts often rely on a ratio of damages to establish whether noneconomic or actual damages are excessive."). However, damage ratios are generally used when reviewing *punitive* damage awards, which are not at issue here, and even in cases involving punitive damages, courts have made it clear that there is no bright-line maximum ratio. *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 424-25 (2003);

14

*Bennett v. Reynolds*, 242 S.W.3d 866, 904 (Tex. App.—Austin 2007, pet. abated). The applicable standard of review requires us to uphold non-economic damage awards that are supported by the evidence, regardless of any ratio of non-economic damages to economic damages.[9] *See Marvelli v. Alston*, 100 S.W.3d 460, 482 (Tex. App.—Fort Worth 2003, pet. denied) ("Matters of past and future physical pain, mental anguish, and physical impairment are particularly within the jury's province. Therefore, as long as sufficient probative evidence exists to support the jury's verdict, neither the reviewing court nor the trial court is entitled to substitute its judgment for that of the jury." (internal citation omitted)).

The jury was presented with evidence that as a result of the accident, Edmond could no longer perform his job as a heavy equipment operator, could no longer participate in a wide range of hobbies and other activities that he had previously enjoyed, continued to suffer from pain, headaches, and muscle spasms, and suffered severe limitations in his range of motion. In light of this evidence, we hold that the jury's damages awards for physical pain, mental anguish, and physical impairment are not excessive in comparison to the amounts awarded for loss of earning capacity and medical expenses.

Simmons and Lindig further argue that the evidence is legally and factually insufficient to support awards for past and future mental anguish. However, Simmons and Lindig

---

[9] We also note that while Simmons and Lindig refer to the awards for past and future physical impairment as non-economic damages, the jury was specifically instructed that damages for physical impairment "can encompass both economic and non-economic losses." *See also Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 764 (Tex. 2003) ("Texas courts, including this one, have long recognized that 'physical impairment' or similar concepts could encompass both economic and non-economic damages.").

15

did not properly preserve error on appeal regarding the legal sufficiency of the evidence to support an award for mental anguish. When a party contends that there is no evidence to support the submission of a specific element of damages in a broad-form jury question, the party must object before the charge is read to the jury. *Harris County v. Smith*, 96 S.W.3d 230, 236 (Tex. 2002). In the present case, the jury was asked to award damages in a lump sum for "[p]hysical pain and mental anguish sustained in the past" and a lump sum for "[p]hysical pain and mental anguish that, in reasonable probability, Edmond L. Bisland will sustain in the future." Simmons and Lindig argue on appeal that there is no evidence to support an award for mental anguish, but did not object to the inclusion of this element of damages in the broad-form question before it was read to the jury and therefore waived any legal sufficiency challenge regarding mental anguish. As for factual sufficiency, Simmons and Lindig are limited to challenging the evidence to support the lump sum awards for physical pain *and* mental anguish. *See Brookshire Bros., Inc. v. Lewis*, 997 S.W.2d 908, 922 (Tex. App.—Beaumont 1999, pet. denied) ("[T]o successfully challenge a multi-element damage award on appeal, an appellant must address all of the elements and show the evidence is insufficient to support the entire damage award."). Given the evidence that Edmond suffered a great deal of pain as a result of his injuries, including feeling as if his head "had glass in it all the time" while the halo was screwed into his skull, that he continues to suffer daily from pain, muscle spasms, and headaches, and that he suffers from anguish resulting from his inability to perform his job as a heavy equipment operator and fear that he may not be able to support his family in the future, we hold that the damages awards for past and future physical pain and mental anguish are not so against the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Southwest*

16

*Tex. Coors, Inc. v. Morales*, 948 S.W.2d 948, 951-52 (Tex. App.—San Antonio 1997, no writ) ("Matters of pain and suffering, which are necessarily speculative and not subject to precise mathematical calculations, are particularly within the province of the jury to resolve and to determine appropriate amounts.").

Finally, Simmons and Lindig argue that the damages awards for past physical impairment and past loss of consortium are excessive because they exceed the amounts requested by the Bislands. Simmons and Lindig provide no authority for the proposition that a damages amount suggested by plaintiffs' counsel acts as a ceiling which the jury may not exceed. We also note that while the jury awarded certain elements of damages in excess of the amounts requested by the Bislands, other damage awards were considerably less than the requested amounts, resulting in an overall damages award that was $993,828.33 less than the total amount requested by the Bislands. In any event, it is within the province of the jury to determine the appropriate amounts to award for past physical impairment and past loss of consortium. *See McDonald v. Dankworth*, 212 S.W.3d 336, 346 n.12 (Tex. App.—Austin 2006, no pet.) (stating that "physical impairment damages are inherently subjective and uniquely within the jury's province"); *P.T. & E. Co. v. Beasley*, 698 S.W.2d 190, 196 (Tex. App.—Beaumont 1985, writ ref'd n.r.e.) (stating that for loss-of-consortium claim, "[t]he duty of resolving the monetary value to be placed on the loss falls upon the jury"). As previously discussed, the awards for physical impairment are sufficiently supported by the evidence. Similarly, given that loss of consortium is a "subjective state[] which present[s] some difficulty in translating the loss into a dollar amount," *Whittlesey v. Miller*, 572 S.W.2d 665, 667 (Tex. 1978), we hold that the award of $52,000 for Rhonda's past loss of consortium covering a period of almost three years is not so contrary to the overwhelming weight of the evidence that it is

17

clearly wrong and unjust. Because Simmons and Lindig provide no authority to suggest that a damage award must be considered excessive on the sole basis that it exceeds the amount requested by plaintiffs' counsel, and because the past physical impairment and loss of consortium awards are supported by the evidence, we overrule this issue as well.

Having disposed of Simmons and Lindig's arguments that the award of future medical expenses represented compensation for surgery on a preexisting condition, that the jury improperly considered a preexisting degenerative disc condition in making certain damage awards, that the ratio of non-economic to economic damages is excessive, that the mental anguish award is unsupported by the evidence, and that the past physical impairment and loss of consortium awards are excessive because they exceed the amounts requested, we overrule Simmons and Lindig's second issue on appeal.

*Prejudgment Interest*

On cross-appeal, the Bislands argue that the trial court erred in allowing a credit against prejudgment interest in the amount of $17,580.51. Under section 304.105(b) of the finance code, prejudgment interest on the amount of any settlement offer is tolled during the period in which the offer may be accepted. *See* Tex. Fin. Code Ann. § 304.105(b) ("If judgment for a claimant is more than the amount of a settlement offer of the defendant, prejudgment interest does not accrue on the amount of the settlement offer during the period that the offer may be accepted."). At a post-trial hearing on the Bislands' motion for entry of final judgment, Simmons and Lindig argued that they made a settlement offer in the amount of $400,000 on March 16, 2007, and asserted that the offer could have been accepted any time until October 10, 2007. On this basis, the trial court awarded a credit of $17,580.51.

The Bislands argue that there is no competent evidence to establish that a settlement offer was extended or that any offer remained open until October 10, 2007. In response, Simmons and Lindig point to a settlement offer letter attached to their response to the Bislands' motion for entry of final judgment. This letter, which appears in the appellate record, is dated March 16, 2007, and states, "We are prepared to offer Four Hundred Thousand Dollars ($400,000) in exchange for a full & final release for all defendants from all claims." The letter does not set a deadline for accepting the offer.

At the hearing on the motion to enter final judgment, the Bislands' counsel stated that on October 10, 2007, he "clearly" told defendants' counsel that the $400,000 offer "was dead, although it had been confirmed that he had been told that before." Simmons and Lindig's counsel asserted, on the other hand, that "no discussion or rejection [of the settlement offer], verbal or written, was done at least until that October 10th day." These statements came in the form of the arguments of counsel, rather than sworn testimony. While Simmons and Lindig's counsel referenced an affidavit swearing to the time line regarding the settlement offer, no affidavit was entered into evidence.[10] After hearing the arguments of counsel, the trial court found in favor of Simmons and Lindig, allowing a credit to cover the period from the date of the offer letter until October 10, 2007.

A party seeking to toll prejudgment interest must provide the court with competent evidence to establish the proper amount of the award. *Quality Beverage, Inc. v. Medina*, 858 S.W.2d 8, 11 (Tex. App.—Houston [1st Dist.] 1993, no writ). "[C]ompetent evidence in this context could be stipulations, affidavits, or live testimony at a post-verdict or timely post-judgment hearing."

---

[10] The transcript of the hearing on the Bislands' motion for entry of final judgment contains no indication that the referenced affidavit was actually presented to the trial court prior to its ruling on the issue of prejudgment interest.

*Foust v. Walters*, 21 S.W.3d 495, 503 (Tex. App.—San Antonio 2000, pet. denied). In *Quality Beverage*, the court held that a party failed to present competent evidence to toll prejudgment interest when it merely attached counsel's settlement offer letter as an exhibit to a response on a post-trial motion. *See* 858 S.W.2d at 11. Similarly, Simmons and Lindig were awarded a credit against prejudgment interest based solely on the arguments of counsel and a settlement offer letter attached to the response to the Bislands' motion to enter judgment. No stipulation, affidavit, sworn testimony, or any other competent evidence on the issue of tolling appears in the record. As a result, we sustain the Bislands' issue on cross-appeal and modify the trial court's judgment to delete the $17,580.51 credit against prejudgment interest. *See Aldine Indep. Sch. Dist. v. Ogg*, 122 S.W.3d 257, 265 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (holding that when reporter's record is available, trial court's findings of fact are binding only if supported by evidence).

## CONCLUSION

We modify the trial court's judgment to delete the credit against prejudgment interest and affirm the judgment as modified.

_____

Diane M. Henson, Justice

Before Chief Justice Jones, Justices Puryear and Henson

Modified, and as Modified, Affirmed

Filed: April 9, 2009

20