

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-12-00712-CV

Tomas **PEREZ**,
Appellant

v.

**SMART CORPORATION, INC.** d/b/a Smart Companies, Inc.,
Appellee

From the 53rd Judicial District Court, Travis County, Texas
Trial Court No. D-1-GN-10-003281
The Honorable Gisela D. Triana, Judge Presiding

Opinion by:     Rebeca C. Martinez, Justice

Sitting:        Karen Angelini, Justice
                Marialyn Barnard, Justice
                Rebeca C. Martinez, Justice

Delivered and Filed:  November 27, 2013

AFFIRMED

Tomas Perez was injured when he fell from a ladder while painting the exterior of a five-story building. Perez brought a suit for negligence against Smart Corporation, Inc. d/b/a Smart Companies, Inc. Following an eight-day trial, the jury returned a 10-2 verdict finding Smart 45 percent responsible and Perez 55 percent responsible. Because the jury apportioned more than 50 percent of the negligence to Perez, a take-nothing judgment was rendered against him. Perez now appeals, complaining that certain evidence was improperly admitted. We affirm the judgment of the trial court.

BACKGROUND

Smart Companies contracted to paint the exterior of the five-story Stoneleigh condominiums in Austin, Texas. Smart then subcontracted the painting project to Perez. Smart provided Perez with a 60-foot, three-section aluminum extension ladder to reach the upper portions and roof of the building. On the day in question, Perez and his three-man crew set the 180-pound ladder up against the side of the building and climbed approximately 46 feet onto the flat roof to do final touch-up painting. When they were finished, two crewmembers completely descended the ladder before Perez untied the top of the ladder from a vent pipe on the roof and began to descend the ladder with a can of paint in his hand. After stepping down a few rungs, the ladder's uppermost "fly" section on which Perez was standing suddenly began to slide or "telescope" downward. Perez fell approximately 45 feet to the ground. Perez broke his back and suffered other permanently disabling injuries.

About a month after the accident, Perez's attorney contacted the Occupational Safety and Health Administration (OSHA) and asked them to investigate the accident. OSHA sent an investigator to interview Allan Tolbert, Smart's president. Tolbert referred the investigator to Ramiro Sandi, a Smart employee and the Stoneleigh project manager. The OSHA investigator never spoke to Perez. The OSHA investigator issued a report which incorrectly stated that the ladder from which Perez fell "had been tied together with a second ladder in order to obtain the necessary height of at least approximately 70 feet." The investigation did not reveal any violations of OSHA standards, and no citations were issued to Smart.

Perez sued Smart seeking damages for the injuries he sustained in the fall. Perez alleged that Smart was negligent in breaching its duty "to provide safer and alternative means to access the roof and upper areas of the structure to be painted, and by failing to provide any form of fall protection." At trial, Perez argued that Smart retained and exercised the right-of-control with

regard to the means of roof access and that Smart was negligent in requiring the use of a 60-foot extension ladder instead of available safer alternatives, such as scaffolding or allowing Perez to access the roof via an existing, but locked, interior stairway. Perez presented testimony from his liability expert, an engineer and architect named Eugene Holland, that OSHA does not allow a ladder to be used for a painting job over 40 feet high because it is unstable. Holland further testified that the use of scaffolding on the Stoneleigh project would have been appropriate under OSHA standards. Holland's expert report, which was admitted into evidence, identified nine alleged violations of OSHA "rules reflecting good custom and practice" by Smart, ranging from failure to provide fall protection and adequate training, to failure to set up the ladder at the proper angle.

During its cross-examination of Holland, Smart sought to admit the OSHA file. Perez objected on hearsay and relevancy[1] grounds, and also argued that the file was inadmissible as a matter of law in state-law tort cases under 29 U.S.C. § 653(b)(4)[2] and *Hill v. Consolidated Concepts, Inc.*, No. 14-05-00345-CV, 2006 WL 2506403 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (mem. op.). Perez argued that although OSHA regulations may be relevant to the common law standard of care, OSHA findings are not relevant to the question of whether that standard was or was not violated in a particular case. The trial court overruled the objections, and admitted the entire OSHA investigation file, stating:

> [I]f you're going to elicit testimony from somebody to tell me whether something is OSHA compliant or not, I'm going to allow them to introduce the official report from OSHA, not for the purposes of saying that yes, obviously OSHA has determined that there was nothing wrong, but for the purposes to rebut the testimony of Holland.

---

[1] Perez argued that the OSHA investigative file was irrelevant because the investigator's finding of "no violations" was based on an erroneous accident scenario.

[2] 29 U.S.C. § 653(b)(4) provides:
> Nothing in this chapter shall be construed to supersede or in any manner affect any workmen's compensation law or to enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment.

After the OSHA file was admitted, testimony was elicited from several witnesses by both sides regarding the applicable OSHA regulations and whether they were violated by Smart. On cross-examination, Holland specifically testified that he believed Smart violated the OSHA standards as they represent and reflect custom and practice in the industry; he declined to answer whether Smart committed OSHA violations. The jury found that Smart exercised some control over "the manner in which Perez had access to paint the higher parts of the Stoneleigh property." The jury also found that Smart and Perez were both negligent and that their concurrent negligence proximately caused the accident. The jury apportioned 45 percent of the responsibility for the accident to Smart, and 55 percent to Perez, thereby denying Perez any recovery. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.001 (West 2008).

On appeal, Perez argues that the trial court erred as a matter of law by admitting into evidence over his objection the OSHA investigation file, which included OSHA's findings that Smart had committed no violations of safety standards.

### STANDARD OF REVIEW

Evidentiary rulings are committed to the trial court's sound discretion. *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007) (per curiam); *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001). A trial court abuses this discretion when it acts without regard for guiding rules or principles. *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012); *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). Even if a trial court errs by improperly admitting evidence, reversal is warranted only if the error was harmful, i.e., it probably resulted in an improper judgment. TEX. R. APP. P. 44.1; *Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004).

## DISCUSSION

Perez contends the trial court erred in admitting the OSHA file because a finding of "no violation" by OSHA is irrelevant and inadmissible. Generally, OSHA *regulations* are admissible as being relevant to the standards of conduct that should have been employed by a defendant. *See Wal-Mart Stores, Inc. v. Seale*, 904 S.W.2d 718, 720 (Tex. App.—San Antonio 1995, no writ); *Carrillo v. Star Tool Co.*, 14-04-00104-CV, 2005 WL 2848190, at *2 (Tex. App.—Houston [14th Dist.] Nov. 1, 2005, no pet.) (mem. op.). However, OSHA evidence beyond regulations, such as findings or citations, is not admissible because it is not relevant to the issue of common law negligence. *See Hill v. Consolidated Concepts, Inc.*, No. 14-05-00345-CV, 2006 WL 2506403, at *4-6 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (mem. op.). The "common law is not expanded by OSHA regulations—either a general contractor owes a duty based upon common law principles, or it does not." *Id.*; 29 U.S.C. § 653(b)(4). In *Hill*, a subcontractor (Hill) fell from a roof while installing shingles, and sued the contractor (CCI) for negligence. *See Hill*, 2006 WL 2506403, at *4-6. The central issue was which party had responsibility to provide fall protection. *Id.* Just as in this case, the jury found both parties negligent, and apportioned 51 percent of the negligence to Hill and 49 percent to CCI. *Id.* On appeal, Hill argued that the trial court erred in excluding OSHA administrative records showing that CCI had been cited and fined by OSHA for roofers' failure to wear fall protection. *Id.* Hill claimed that CCI had opened the door to all OSHA evidence when it introduced a form signed by Hill in which Hill agreed to follow all OSHA regulations and safety standards. *Id.* The court of appeals affirmed the trial court's refusal to admit the OSHA administrative records because they were not relevant to liability. *Id.* at *4 ("the citations and fines paid had no bearing on liability").

Just as evidence of OSHA citations and fines may not be used to establish negligence per se, we conclude that a finding of no violation of OSHA regulations is similarly inadmissible to

exculpate a defendant. *See id.* at \*4-6 (holding trial court did not err in excluding OSHA evidence, including OSHA regulations, OSHA administrative records, and OSHA fines and citations because evidence was irrelevant to issue of common law negligence); *see also Carrillo*, 2005 WL 2848190, at \*2-3 (trial court did not abuse its discretion in excluding letter written by OSHA investigator to plaintiff's employer regarding accident and declaring that no citation would issue); *Behanan v. Desco Distrib. Co.*, 98 Ohio App.3d 23, 647 N.E.2d 830, 831-32 (1994) (holding trial court did not err in refusing to admit inspection and safety records compiled by OSHA because use of OSHA regulations to establish that product was unreasonably dangerous is improper; OSHA should not provide a basis for civil liability).

Nonetheless, Smart argues that Perez opened the door to the OSHA file as rebuttal evidence when he presented evidence, through his liability expert, of alleged OSHA violations. We disagree. As discussed above, while evidence of OSHA *regulations* is admissible and relevant to the standards of conduct that should have been employed by a defendant, evidence of OSHA *findings* or citations is not relevant to the issue of negligence and is therefore inadmissible. *See Hill*, 2006 WL 2506403, at \*4-6. Further, we disagree that Holland's testimony "opened the door" to the admission of the OSHA file. Holland did not testify, as Smart avers, that Smart actually committed violations of OSHA regulations. To the contrary, prior to the introduction of the OSHA file, Holland merely testified that it was inappropriate under OSHA standards to use a ladder for a painting job over 40 feet high. Holland specifically declined to answer whether Smart committed OSHA violations. Accordingly, we conclude that the trial court abused its discretion in admitting the OSHA file.

Having found error, we must now conduct a harm analysis to determine whether the error resulted in the rendition of an improper judgment. Even when an evidentiary ruling is erroneous, we will not reverse unless the ruling probably caused rendition of an improper judgment. TEX. R.

APP. P. 44.1(a); *Nissan Motor*, 145 S.W.3d at 144. In determining whether the error was harmful, we review the entire record and require the complaining party to demonstrate that the judgment turns on the particular evidence admitted. *McShane*, 239 S.W.3d at 234; *Nissan Motor*, 145 S.W.3d at 144; *see also Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 236 (Tex. 2011) (reviewing court evaluates the entire case from voir dire to closing argument, considering the evidence, strengths and weaknesses of the case, and the verdict). We also consider whether counsel emphasized the erroneous evidence and whether the admission of the evidence was calculated or inadvertent. *Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 874 (Tex. 2008); *Nissan Motor*, 145 S.W.3d at 144 ("[W]hether erroneous admission is harmful is more a matter of judgment than precise measurement."). "[I]t is not necessary for the complaining party to prove that 'but for' the exclusion of evidence, a different judgment would necessarily have resulted." *McCraw v. Maris*, 828 S.W.2d 756, 758 (Tex. 1992). The complaining party must only show "that the exclusion of evidence probably resulted in the rendition of an improper judgment." *Id.*

In arguing that an improper judgment resulted, Perez asserts that given the narrow 45 percent to 55 percent split of the jury's apportionment of comparative responsibility, the references by Smart to the OSHA file and to OSHA's finding that Smart did not violate any safety standard probably tipped the scale and caused the jury to assign less responsibility for the accident to Smart. Essentially, Perez contends that the jury's apportionment of liability would have been different if the OSHA file had not been admitted.

### *The Evidence at Trial*

Ramiro Sandi's deposition testimony was presented to the jury. Sandi, a Smart employee, served as the project manager for the Stoneleigh project. Sandi had worked with Perez for several years and offered the Stoneleigh job to him. Sandi was not on-site often, usually no more than an hour a day, if at all. Sandi's main role as project manager was to oversee the amount of paint that

was used. Other than that, Perez was in charge of supervising his painting crew. Sandi affirmed that as the subcontractor, Perez was in charge of his safety and the safety of his crew. The subcontractor is also responsible for fall protection. Sandi knew that Perez had used fall protection in the past, and that he owned a safety harness. Perez never asked Sandi for additional help or equipment, nor did Perez say he did not understand how to use the 60-foot extension ladder. Perez never indicated to Sandi that it was unsafe to take the Stoneleigh job.

Perez testified that he had been a painter for about 18 years at the time of the accident and was experienced using ladders. Perez owned a 40-foot extension ladder, which works the same way as a 60-foot extension ladder. Smart had subcontracted several painting jobs to him in the past. When he worked on jobs for Smart, he was in charge of the job.

When Perez first viewed the Stoneleigh jobsite with Sandi, Sandi told him they could not use a boom lift on the project because it would not fit. Perez then asked Sandi about using scaffolding, but he also said it would not fit and that it was too expensive to rent. Sandi told Perez to use a 60-foot ladder with a "32[-foot ladder] tied on top of it." When Perez told Sandi that was too dangerous, Sandi replied, "[d]on't worry[,] Mexicans can invent a solution to this." Sandi told Perez not to enter the building to access the painting work because people might think he was up to something and call the police. Perez testified that despite the dangerous conditions, he accepted the job because he had a newborn and he needed the money.

Perez and three crewmembers worked on the Stoneleigh project for about seven days; the accident occurred on the last day. Prior to the accident, Perez admitted he had had no problems with the 60-foot ladder. Perez and his three-man crew set up the ladder on the day of the accident. Just before Perez's fall, two workers descended the ladder before Perez. One man went down after Perez untied the ladder from the roof vent pipe, but Perez held the ladder at the top while the man descended. Perez then untied the rope that was securing the ladder to a metal vent pipe. He began

to descend the ladder with an empty gallon paint can in his left hand, and after taking two or three steps, the ladder began to close and he fell. Perez admitted that he did not check to see that the ladder was locked before descending. Perez also did not recall seeing warning labels or diagrams on the ladder.

Phillip Garwood, Smart's vice president and the son-in-law of the company's owner, testified that he delivered the 60-foot ladder to the jobsite for Perez. Garwood knew that Perez had used a 60-foot extension ladder at a previous Smart project. Smart had previously offered an OSHA training session (10-hour safety course) to Perez, but Perez did not attend. According to Garwood, a boom lift would not have worked at the Stoneleigh project because there was not enough space. Garwood stated that Perez could have had someone hold the ladder at the bottom for him after he had untied it at the top. While Garwood was at the Stoneleigh jobsite, Perez showed Garwood a safety harness that he had in his truck. Perez, however, disputed this testimony, and stated that he did not have a safety harness for the Stoneleigh job. He only used a harness if provided one by Smart, and the harness belonged to Smart.

Allan Tolbert, the owner of Smart Companies, testified that he had known Perez for a long time. He stated that Perez was a very experienced painter, and described him as intelligent and "a good leader." In Tolbert's opinion, Perez could have used a 40-foot ladder with an extension pole to reach the upper portions of the Stoneleigh building instead of a 60-foot ladder. Tolbert testified that it is up to the subcontractor to decide which equipment he needs to do the project. Tolbert did not think that scaffolding or a boom lift would have worked on this project.

Holland, Perez's liability expert, testified that it was not reasonable to require Perez to use the 60-foot ladder to access the roof because perfectly good access was available through the interior stairway leading to the roof. Holland additionally found it unreasonable to require Perez to climb the 60-foot ladder before he was able to secure the ladder to the rooftop. Moreover,

Holland stated Smart did not provide an acceptable means of anchoring the ladder at the top of the roof. Holland himself had never used a 60-foot ladder, which he described as very heavy and challenging to maneuver, even with the required four-man crew. Holland opined that the accident occurred when tension developed in the line between the ladder and the tie off, causing the top section of the ladder to pull up and become unlocked.

The evidence showed that the height of the wall where the ladder was placed was 43 feet and two inches. On cross-examination, Holland conceded that OSHA rules were not violated by using a 60-foot ladder to reach a height of 43 feet, i.e., to access the roof. But, Holland clarified that it was not permissible to use a 60-foot ladder to "do work," as Perez was doing at the time of the fall.

Dean Bernal, Smart's liability expert, testified that he was familiar with OSHA regulations requiring that a three-point contact be maintained at all times on the ladder, meaning that either two hands and one foot, or two feet and one hand, must be on the ladder at all times. He later conceded that another body part, such as the chest, can be used to maintain three-point contact with the ladder in lieu of a hand or a foot. Bernal opined that Perez fell because he did not have the ladder properly set up and did not maintain a three-point contact with the ladder when descending the ladder while carrying an empty one-gallon paint can in his left hand. Bernal criticized Holland's report, and disagreed with Holland's opinion that a ladder over 40 feet should not have been used on the project. He stated that the use of a 60-foot ladder was "perfectly acceptable." Bernal knew the OSHA investigator to be a "very thorough" inspector.

On cross-examination, Bernal admitted that he would not personally use a 60-foot ladder on a project such as this one because his company owns a man lift and scaffolding. In fact, Bernal conceded that he had never been on a 60-foot ladder; the highest ladder he had been on was a fixed 44-foot ladder. He agreed that the use of a man lift would have been safe for this project.

Dale King, the Werner ladder representative, testified that a ladder that is properly locked will not telescope, or slide down. King examined the ladder involved in the accident, and saw nothing indicating that the ladder had in fact been telescoped. In the past, when King saw ladders that were telescoped, he often observed bends to the ladder rungs or rungs that were pierced by the lock tip. King also noted that the ladder from which Perez fell was set up at a much more vertical angle than is recommended. King described Perez's theory of the accident—that the ladder was properly locked, then it was pulled up five inches and became unlocked, after which another painter successfully descended the ladder before Perez began to descend and the ladder telescoped—as "a little farfetched." King opined that the accident was caused by Perez and his failure to follow the bilingual and pictorial warning labels on the ladder.

At closing, Smart argued that OSHA inspected the incident and issued no citations; however, the bulk of its closing argument focused on the evidence of Perez's alleged negligence. Counsel for Smart submitted that Perez was negligent in: (1) failing to lock the ladder in place before descending it; (2) setting up the ladder; (3) failing to visually inspect the locks before descending; (4) descending the ladder with a paint can in one hand; and (5) failing to follow pictorial warning labels and diagrams on the ladder. The defense further argued that it was Perez's choice not to use the interior stairs, and that he should have asked if he wanted to use the stairs. Smart submitted that Perez's percentage of fault "would be somewhere between the 90 to 100 percent range." As far as Smart's negligence, counsel again emphasized the OSHA report and the finding of no violations. Counsel implied that if Smart had done anything to cause or to contribute to the accident, OSHA would have found it.

Perez argued to the jury that Smart was negligent in failing to give him safer alternatives to the 60-foot ladder, such as scaffolding or access to the interior stairs. Perez further argued that Smart "had him over a barrel" because his son had just been born and he needed the money.

Counsel maintained that Perez was not negligent at all. Nonetheless, counsel instructed the jury that it did not have to get to damages if it found Perez more than 50 percent responsible.

*Analysis*

Our review of the entire record does not support Perez's assertion that the erroneous admission of the OSHA file caused the jury to render an improper verdict by increasing Perez's percentage of responsibility above 50 percent, thereby prohibiting any recovery. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.001 (West 2008). Ample evidence exists in the record—even without considering the OHSA file—from which the jury could have concluded that Perez bore more responsibility for the accident than Smart.

The bulk of the evidence at trial centered on the fact that, as the subcontractor, Perez was in charge of his own safety and that of his crewmembers. Perez was an experienced painter who had done other projects for Smart using a 60-foot extension ladder. No one from Smart testified that Perez had voiced any concerns about using the 60-foot ladder for the Stoneleigh project. Once he elected to do the job with the 60-foot ladder, Perez was responsible for exercising proper ladder safety. There was testimony that Perez descended the ladder while holding an empty can of paint in one hand, preventing him from maintaining a proper three-point contact with the ladder. Additionally, given Garwood's testimony that Perez had a harness in his truck, Perez chose not to use a safety harness, as he had done in the past. Moreover, although Perez testified he properly set up and locked the ladder on the morning of the accident, he also admitted that did not check to see that the ladder was locked before descending from the roof, just prior to the fall. On the last day of the seven-day project, two other workers descended the ladder immediately before Perez without incident. The ladder did not fall backward, but according to Perez, the top extension telescoped down. According to the representative for the ladder manufacturer, the ladder revealed no evidence of telescoping, and the accident could not have occurred as Perez described if the

ladder was properly locked. Thus, the jury could have determined that Perez's failure to properly lock the ladder heavily contributed to the accident.

Beyond the fact that there was ample evidence indicating Perez's responsibility for the accident, the OSHA findings were criticized by Perez's expert. Holland gave "no credence" to the OSHA report and noted that the report was completely inaccurate because it stated that Perez used a ladder tied together with a second ladder to access a height of 70 feet. The OSHA investigator's finding of no violations made no sense to Holland. Thus, the jury was certainly made aware of the OSHA report's inaccuracies. It is the jury's role to resolve conflicts in the evidence and to decide what weight, if any, to give the evidence. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819-20 (Tex. 2005). It would be speculative for us to conclude that the jury gave controlling weight to the OSHA file, especially considering that the jury found Smart negligent despite evidence that it committed no OSHA violations. We therefore conclude that the error in admitting the OSHA file did not result in the rendition of an improper judgment and was thus harmless.

## CONCLUSION

Based on the foregoing, we overrule Perez's sole issue on appeal and affirm the judgment of the trial court.

Rebeca C. Martinez, Justice