Sherry Radack, Chief Justice
Seventy-six-year-old plaintiff-appellant Algarie Graham was struck by an 18-wheeler truck. Graham sued to recover for his injuries, and the jury returned a take-nothing judgment in favor of the defendant-appellees James Scott (the driver) and Texas Concrete Enterprise Ready Mix (Scott's employer). On appeal, Graham argues that the trial court abused its discretion by overruling his hearsay objection to *247 admission of a witness's statement in the police report and that its admission was reversible error. Concluding that Graham has not established reversible error, we affirm.
THE TRIAL
It is undisputed that Scott struck Graham with a Texas Concrete truck on March 7, 2014 at the intersection of Homestead Road and Hwy 610. At trial, however, the parties presented different versions of how that accident happened. Graham and Scott testified, but there were no third-party witnesses to the accident-only witnesses who could describe what they saw before and immediately after.
Scott testified that, on the morning of March 7, 2014, he had just picked up a load of rocks in the 18-wheeler truck he drives for his employer, Texas Concrete, when he headed south on Homestead Road. As he came over a hill, the traffic-signal light he was approaching at Homestead and Hwy 610 was red. Scott saw Graham standing between two telephone poles at the intersection corner on the right side of the road. Just as Scott came to a stop at the intersection, the light turned green. He testified that he came to a "rolling stop"-which he described as meaning he stopped the truck just long enough to change gears-and then began to turn right onto the Hwy 610 frontage road.
It was a wide turn and, as Scott brought his truck and trailer into the right-hand lane on the feeder road, he saw "people waving and yelling and all that." He pulled over, put his emergency blinkers on, walked behind his trailer, and saw Graham lying on the ground. Graham was on the feeder road about three or four feet behind Scott's trailer. Scott testified that he had not seen Graham enter the road, and that Graham was not in the crosswalk when Scott found him in the street after Graham was hit. He also stated that he had a clear view of the crosswalk in front of his truck because it has a sloped hood.
Graham testified that, on the morning of March 7, 2014, he was walking to the bus stop on Homestead so he could take the bus to the VA Hospital. He had taken the same route many times. He was not rushing, as he was well ahead of schedule. His route took him south down Homestead, and then across Homestead to the bus stop on the other side of Homestead at the intersection of Hwy 610.
The traffic light directing southbound Homestead traffic was green as Graham was walking, and turned red just before he reached the intersection with Hwy 610. Graham saw Scott's Texas Concrete truck stopped at the intersection with the other traffic. Graham testified that he stepped off the curb into the crosswalk and in front of the stopped truck, and the truck "took off and knocked me down." He clearly remembers that Scott's traffic signal was still red, and that the truck took off quickly into a right-hand turn while he was in front of it. He did not look for a cross-walk signal because he assumed if the southbound traffic was stopped by a red light, it was safe to cross.
Graham described his memory of what occurred after that as "hazy." He recalls feeling his leg get hit, but did not feel pain at the time, even though it was broken. He testified that he was hit by the front driver-side of the truck near the headlamp. Graham also testified that he did not know which tire ran over him, but speculated that it must have been the front driver-side tire. Graham recalls trying to get back to the edge of the street, but a police officer told him to not move until an ambulance arrived. He was then transported to the hospital, and his leg was operated on the following day.
*248 Leroy Coleman was at a Shell gas station on the corner of Homestead and Hwy 610 at the time of the accident. It was about 7:30 a.m., during morning rush hour. He testified that traffic on Homestead was heavy and continuous. Coleman saw Scott's truck moving south on Homestead and come to a stop at a red traffic light when it reached the intersection at Hwy 610. The light turned green a few seconds later, and Coleman saw the truck start to turn right. He did not see Scott's face or which way Scott was looking as he began to turn. Coleman had an unobstructed view of the crosswalk, but never saw anyone in the crosswalk in front of the truck, and he did not see Graham crossing the road.
Coleman testified that he did not see the truck strike Graham, but heard a commotion after the trailer "was in a turning position, turning." Coleman then heard Graham screaming and moving towards him. When Coleman first saw Graham, Graham was behind the trailer, on Homestead, and the trailer was still midway into its turn. Graham was "pretty close" to the crosswalk when Coleman saw him. Several people ran to Graham's assistance. It looked to Coleman like Graham was "trying to take a shortcut."
Dr. Ivey, an orthopedic surgeon with LBJ Hospital, testified to the severity of Graham's injuries, his surgery and treatment, and about Graham's recovery. The tibia in Graham's right leg was broken into several pieces. His left foot was cut, covered in bruises, and had broken bones that had penetrated through the skin. When he was discharged from LBJ about a month after the accident, Graham transferred to a nursing home to regain mobility. He could not walk and needed physical and occupational therapy to build up his strength and ability to walk, and surgical services to help with remaining open sores on his leg and foot. After two months, Graham was transferred to a rehabilitation hospital.
Graham's medical records contain a history and description of the accident and Graham's injuries as reported by Graham. When he arrived at LBJ by ambulance, the records reflect that Graham told the doctors a truck ran a red light and turned, hitting him on his left side. Elsewhere in the medical records reflect Graham told a resident that he "doesn't remember exactly how he got hit."
Officer Tabor with the Houston Police Department testified that he arrived on the scene a few minutes after the accident. When he arrived, there was a Harris County officer-either with the constable's office or sheriff's department-already on the scene and parked in the Shell parking lot. Tabor testified that he recalled Graham was injured with foot or leg trauma. Tabor called an ambulance and took a statement from Scott. When he testified at trial, Tabor had little recollection of what anyone told him, and his written report only contained what Scott and Coleman had told him.
Tabor testified that Scott told him that he had not seen Graham prior to hitting him and that the first time he saw Graham was when he looked in his mirror and saw him in the road. He testified that Coleman told him that Graham was on the Hwy 610 frontage road when Coleman first saw him.
Office Tabor said he did not recall where Graham was when he arrived on the scene, but believed that Graham was already in the Shell parking lot. Graham was standing, but Tabor did not remember if it was with assistance. Tabor testified Graham told him that he had a green light for a pedestrian walkway.
THE ACCIDENT REPORT
Because Officer Tabor could not recall at trial most of what Scott had told him, *249 the parties agreed to admit into evidence the part of Tabor's report containing a three-sentence narrative about what Scott told him on March 7, 2014:
I was turning right on the loop from Homestead and I had a green light. I looked behind me after I made the turn and saw a man down in the street. I then stopped to check on him and he told me I hit him.
Graham objected, on hearsay grounds, to the remainder of the Tabor's report being introduced into evidence, including Tabor's notes about what Coleman told him, and Tabor's accident diagram and conclusion about the point of impact. The trial court overruled the objection as to Coleman's statement. The introduced report contains the following statement Tabor attributed to Coleman:
I saw the guy trying to wave down the truck like he was trying to get a ride and after the truck passed, the man stepped into traffic and was hit with the back wheel.
The trial court excluded the remainder of the accident report. The jury returned a take-nothing verdict in the appellees' favor. Graham contends on appeal that the trial court admitting of Coleman's hearsay statement in Tabor's police report was reversible error.
STANDARD OF REVIEW-ADMISSION OF EVIDENCE
We review a trial court's rulings on the admission or exclusion of evidence under an abuse-of-discretion standard. Broders v. Heise , 924 S.W.2d 148, 151-52 (Tex. 1996). A trial court abuses its discretion if it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law or if it clearly fails to correctly analyze or apply the law. In re Cerberus Capital Mgmt., L.P. , 164 S.W.3d 379, 382 (Tex. 2005) (orig. proceeding) (per curiam).
A person seeking to reverse a judgment based on evidentiary error need not prove that but for the error a different judgment would necessarily have been rendered, but only that the error probably resulted in an improper judgment. TEX. R. APP. P. 44.1 ; Nissan Motor Co. Ltd. v. Armstrong , 145 S.W.3d 131, 144 (Tex. 2004) ; City of Brownsville v. Alvarado , 897 S.W.2d 750, 753 (Tex. 1995). We review the entire record, and require the complaining party to demonstrate that the judgment turns on the particular evidence admitted. Armstrong , 145 S.W.3d at 144 ; Interstate Northborough P'ship v. State , 66 S.W.3d 213, 220 (Tex. 2001) ; GT & MC, Inc. v. Texas City Ref., Inc. , 822 S.W.2d 252, 257 (Tex. App.-Houston [1st Dist.] 1991, writ. denied). Whether erroneous admission of evidence is harmful is more a matter of judgment than precise measurement. Armstrong , 145 S.W.3d at 144. We may also consider the amount of emphasis placed on the erroneous evidence, and whether there was contrary evidence the improperly admitted evidence was calculated to overcome. Id.
PARTIES' ARGUMENTS
Graham argues that "even though [Coleman's] statement was contained in a 'government record,' it is still inadmissible hearsay." He contends that the statement does not constitute "factual finding" by Tabor, and that it is not admissible as an excited utterance or prior consistent statement. Graham argues that admission of the statement was reversible error.
Appellees respond that Coleman's statement contained in Officer Tabor's report was admissible "because (a) it was a prior consistent statement and thus not hearsay; or it was within hearsay exceptions as (b)
*250 part of the investigating officer's factual finding about the point of impact; and (c) an excited utterance." Appellees further contend that even if the statement was not admissible, Graham has not demonstrated that its admission probably caused the rendition of an improper judgment.
HEARSAY
Hearsay is a statement that: "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." TEX. R. EVID. 801(d). A statement is not hearsay if it "is consistent with the declarant's testimony and is offered to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying." TEX. R. EVID. 801(e)(1)(B).
"Hearsay is not admissible unless any of the following provides otherwise: a statute; these rules; or other rules prescribed under statutory authority." TEX. R. EVID. 802. Among the exceptions to the rule against hearsay are the two cited by appellees as relevant here:
....
(2) Excited Utterance. A statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused.
....
(8) Public Records. A record or statement of a public office if:
(A) it sets out:
(i) the office's activities;
(ii) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or
(iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and
(B) the opponent fails to demonstrate that the source of information or other circumstances indicate a lack of trustworthiness.
....
TEX. R. EVID. 803. The proponent of hearsay has the burden of showing that the testimony fits within an exception to the general rule prohibiting the admission of hearsay evidence. Volkswagen of Am., Inc. v. Ramirez , 159 S.W.3d 897, 908 n.5 (Tex. 2004).
We conclude that Graham has not established that any error was "reasonably calculated to cause and probably did cause rendition of an improper judgment." Williams Distrib. Co. v. Franklin , 898 S.W.2d 816, 817 (Tex. 1995) (per curiam).
There were two theories presented at trial. On the one hand, Graham testified that he stepped into the crosswalk in front of Scott's stopped truck, while Scott's traffic signal light was red, and that Scott then turned right onto the feeder road, hitting Graham in the process. Graham argued at trial that his injuries were caused by being run over by the truck's single front tire, and that his injuries were not severe enough to have been caused by a double tire on the truck's trailer.
Scott, on the other hand, testified that he came to a brief stop to change gears, had a green light, had a clear view of the crosswalk, and did not see anyone in the crosswalk when he turned right onto Hwy 610 frontage road. He saw Graham on the ground behind his truck after he pulled over in response to witnesses' commotion. Appellees argued at trial that Graham had never been in the crosswalk, that his injuries were not consistent with being "run over" by tires on a tractor or trailer, and that Graham was instead hit by Scott's *251 trailer because he stepped into the road after Scott had begun legally turning right.
Coleman's live testimony at trial, as well as his one-sentence statement in the police report, support Scott's version. The statement from the police report forming the basis of Graham's appeal is "after the truck passed, [Graham] stepped into traffic and was hit with the back wheel." Graham complains that the jury's verdict must have turned on this statement as it was "the only positive evidence supporting the verdict rendered." Accordingly, he claims the statement was "crucial to a key issue," "not cumulative of other evidence," and "probably (although not necessarily) caused the rendition of an improper judgment." (quoting Reliance Steel & Aluminum Co. v. Sevcik , 267 S.W.3d 867, 871-73 (Tex. 2008) ). We disagree.
Coleman testified live at trial before his statement from police report was admitted, so he was not cross-examined about the statement. Nonetheless his testimony unequivocally clarified that he did not actually see the impact. He explained that he was pumping gasoline into his vehicle at a Shell station, and the jury was provided pictures reflecting his position and line-of-sight of the intersection. He testified that he had an unobstructed view of the crosswalk. He saw Scott's traffic light turn from red to green, and saw Scott start to make a right-hand turn. Coleman did not see anyone in the crosswalk. He did not see Scott's truck hit Graham, and next heard a commotion. He testified that he first saw Graham behind Scott's trailer on Homestead. He then saw Graham screaming and coming towards him.
Coleman's statement in the police report put the point of impact at the trailer's back tires. That is consistent with Scott's testimony and Coleman's testimony that no one was in the crosswalk in front of the truck and Graham was behind the trailer immediately after the accident. We agree with Graham that the point of impact was a critical issue, but Coleman clarified at trial that he did not witness the accident. The jury, charged with evaluating evidence and witness credibility, was then left with the task of weighing the evidence and resolving conflicts with the knowledge that there was no eyewitness to impact. E.g. , Levine v. Steve Scharn Custom Homes, Inc. , 448 S.W.3d 637, 655 (Tex. App.-Houston [1st Dist.] 2014, pet. denied) ("It is the province of the jury to resolve conflicting evidence, to determine the credibility of the witnesses, and to weigh their testimony."). Because we conclude that Graham has not met his burden of demonstrating that the admission of the statement probably caused the rendition of an improper judgment, we overrule Graham's sole issue.
CONCLUSION
We affirm the trial court's judgment.