

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-14-00310-CV

IN THE INTEREST OF G.H. AND
G.H., CHILDREN

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 323-97764J-12

----------

## MEMORANDUM OPINION[1]

----------

Appellants G.D.H. (Father) and K.B. (Mother) appeal from the trial court's order terminating their rights to twins G.H. and G.H. (Boy and Girl). Father complains in three issues that the evidence is legally and factually insufficient to support the trial court's best-interest, endangerment, and constructive-

---

[1]*See* Tex. R. App. P. 47.4.

abandonment findings[2] and that the trial court abused its discretion by admitting exhibits relating to his criminal history that occurred more than ten years before trial.  In three issues, Mother complains that the evidence is legally and factually insufficient to support the trial court's endangerment and best-interest findings.[3] Because we hold that the evidence is legally and factually sufficient to support the trial court's judgment and that any error in the admission of exhibits relating to Father's criminal history from more than ten years before trial is harmless, we affirm the trial court's judgment.

**Sufficient Evidence of Endangerment**

In her first two issues, Mother contends that the evidence is legally and factually insufficient to support the trial court's endangerment findings.  Within his first two issues, Father raises the same complaints.  As we have previously explained,

> Endangerment means to expose to loss or injury, to jeopardize.  The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child.  Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being.  Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child.

---

[2]*See* Tex. Fam. Code Ann. §161.001(1)(D)–(E), (N), (2) (West 2014).

[3]*See id.* §161.001(1)(D)–(E), (2).

. . . . Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act. Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required.

To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the child, and the child is not required to suffer injury. The specific danger to the child's well-being may be inferred from parental misconduct alone, and to determine whether termination is necessary, courts may look to parental conduct both before and after the child's birth. . . . As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being.

Additionally, a parent's mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in conduct jeopardizing the child's physical or emotional well-being. . . . [E]ven if a parent makes dramatic improvements before trial, evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of . . . irresponsible choices.[4]

We have also stated,

Abusive or violent conduct by a parent may produce an environment that endangers the child's physical or emotional well-being, as may parental drug use and drug-related criminal activity. Drug use and its effects on a parent's life and ability to parent may likewise prove an endangering course of conduct. Additionally, even though imprisonment alone does not prove that a parent engaged in a continuing course of conduct that endangered the physical or

---

[4]*In re L.E.M.*, No. 02-11-00505-CV, 2012 WL 4936607, at *2 (Tex. App.—Fort Worth Oct. 18, 2012, no pet.) (mem. op.) (citations and internal quotation marks omitted).

emotional well-being of his child, it is nevertheless a factor that we may properly consider on the issue of endangerment.[5]

Mother, who was twenty-four years old at trial, began drinking alcohol at the age of fifteen, smoking marijuana at the age of seventeen, and using cocaine at the age of twenty-one. She testified that she had been with Father since she was eighteen years old. A year before her pregnancy with the twins, she was arrested for possession of marijuana. She gave birth prematurely to the twins in September 2012. Mother and the newborn babies tested positive for cocaine and marijuana. But Mother testified that she knowingly used only marijuana during the pregnancy and that Father did not know about her cocaine use until after the delivery.

After the twins tested positive for drugs, the Texas Department of Family and Protective Services (TDFPS) opened a family-based safety services (FBSS) case. According to Rosalyn Hubbard, the FBSS supervisor in this case, TDFPS's concerns raised at the first family group conference were Mother's drug use, Father's suspected drug use, "a profound suggestion that he basically was controlling her," and the babies' health issues. Mother admitted drug use at her assessment and signed an acknowledgment of drug use on November 5, 2012. But she went to inpatient rehab at VOA Light in November 2012, still testing positive for cocaine and marijuana, and the children were placed with her there in

---

[5]*In re S.G.*, No. 02-14-00245-CV, 2015 WL 392772, at *5 (Tex. App.—Fort Worth Jan. 29, 2015, no pet. h.) (mem. op.) (citations omitted).

4

December 2012 after she had made progress for a month. In January 2013, though, after the second family group conference, Mother convinced her younger sister, K., who also attended the family group conference, to drop her and the twins off at a store instead of taking them directly back to the VOA Light rehab center. Mother bought alcohol with a friend and drank a beer, and then the friend drove Mother and the twins back to VOA Light. Once there, Mother, still under the influence of alcohol, acted out aggressively when VOA staff refused to give her a cigarette. VOA Light then discharged her from the program, and the twins were removed from Mother and placed in foster care. The twins had been in Mother's care for only a month.

In January 2013, Mother admitted to having used ecstasy. She was also in jail in January 2013; Father told Gladys Demus, the TDFPS caseworker, that Mother had been arrested for domestic violence. In July and August 2013, Mother failed to get a court-ordered hair test. In late September 2013, she signed an acknowledgment of cocaine use.

At trial, Mother did not dispute that she continued to use drugs after TDFPS opened its case and within a month of the initial trial setting date, but she insisted that she had remained sober since a few days before October 28, 2013, when she began inpatient drug rehab at Pine Street. The trial court admitted evidence, however, that Mother continued to test positive for drugs after that date and as late as the week before the trial began. Mother admitted to having visited a crack lab with her best friend before an April 1, 2014 positive drug test but

5

insisted that she did not use drugs in the crack house; the trial began just six weeks later. Demus testified that a drug house is an endangering environment for children.

Based on the appropriate standards of review, we hold that the evidence is legally[6] and factually[7] sufficient to support the trial court's endangerment findings against Mother. We overrule her first two issues.

Mother testified that Father has three other children, daughters aged fifteen, seven, and three at the time of trial, who live with their mothers. Mother also stated that he was in jail during her pregnancy and that she "was stuck with his two children" and unable to work during that time, which was one of the stressors causing her to use drugs toward the end of her pregnancy. Mother stated that she smoked marijuana with Father before the pregnancy but that she did not use cocaine with him until after the pregnancy and that he did not know about her cocaine use until after the twins were born. Mother admitted at a family group conference in January 2013 and testified at trial that she had admitted in an October 2013 hearing that Father was her trigger for using drugs.

Drug use was also an issue for Father during the case. Father acknowledged testing positive for cocaine on December 19, 2012, about three

---

[6]*See In re E.N.C.*, 384 S.W.3d 796, 808 (Tex. 2012); *In re J.P.B.*, 180 S.W.3d 570, 573–74 (Tex. 2005).

[7]*See In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014); *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

months after the twins' birth and after they had been placed with his sister and parents. Hubbard testified without objection that Father acknowledged his cocaine use on December 19, 2012. He also tested positive on January 11, 2013, the day of the emergency removal of the twins due to Mother's discharge from VOA Light. Mother testified that they last used together around the beginning of October 2013. She also testified that Father had not done anything to stop using drugs.

Hubbard testified that at the first family group meeting, Father repeatedly said that he could use whatever drug he wanted to and that CPS could not do anything about it. Demus, who received the case in January 2013 from the investigation unit, testified that at the January 2013 visit with the children, Father similarly "said that he can do whatever he wants. He can do drugs, cocaine, whenever he wants to, nobody can tell him what to do."

Mother testified that Father's criminal history includes assaults, including an assault of the mother of two of his other children, and failure to pay child support. Father has a history of domestic violence against the mother of two of his other children. In 2012, he was convicted of committing assault–bodily injury of a family member; she was the complainant. The indictment admitted without objection with that judgment provides that he also had a 2000 assault–bodily injury conviction for assaulting a family member and a 2002 aggravated assault with a deadly weapon conviction. In 2010, Father was convicted of interfering

7

with public duties, and in 2005, he was convicted of the possession of less than two grams of marijuana.

Mother admitted at trial that she had testified at a prior hearing that physical and verbal domestic violence had also occurred in her relationship with Father. Mother's licensed professional counselor (LPC) testified that Mother had reported a history of psychological abuse between Father and herself. On a visit with the twins that coincided with the day of the emergency removal in January 2013, Father cursed and walked out of the room whenever Hubbard walked in. He slammed doors, resulting in framed items falling off walls and breaking.

Hubbard also reported that Father told TDFPS that he had other children, so he was not worried about the twins; Mother could do whatever she wanted to. Father went over a year without visiting the twins, who were approximately twenty months old at trial. He attended only five visits from the time the children were removed in January 2013. Father also refused to complete any of the services offered by TDFPS.

Applying the appropriate standards of review, we hold that the evidence is legally[8] and factually[9] sufficient to support the trial court's endangerment findings

---

[8]*See E.N.C.*, 384 S.W.3d at 808; *J.P.B.*, 180 S.W.3d at 573–74.

[9]*See A.B.*, 437 S.W.3d at 500; *H.R.M.*, 209 S.W.3d at 108; *C.H.*, 89 S.W.3d at 28.

against Father.  Because of this disposition, we do not reach Father's subissues challenging the trial court's finding of constructive abandonment.[10]

**Sufficient Evidence for Best Interest Findings**

In her third issue, Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's best-interest finding against her.  In the remainder of his first two issues, Father also challenges the legal and factual sufficiency of the evidence supporting the best-interest finding against him.

In addition to the evidence supporting the endangerment findings above, the trial court also received evidence that Boy and Girl had special needs.  They were born prematurely, and both still had medical issues at the time of trial.  Girl was born with a congenital heart defect, was due to have open heart surgery soon, and would have a long recovery after her surgery.  Boy had colon surgery soon after his birth, stayed in the hospital for several weeks, and was still receiving occupational, developmental skills, and speech therapy.  There was evidence that both children have asthma and that Boy also suffers from allergies. Boy may also have hearing loss.  Both children were on daily medications.  The CASA volunteer testified that Girl will be on a heart monitor and special medications after her surgery.  Further, Girl should be confined in the hospital for

---

[10]*See* Tex. R. App. P. 47.1; *In re A.V.,* 113 S.W.3d 355, 362 (Tex. 2003); *In re E.M.N.,* 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.).

about two weeks after her surgery, and her at-home recovery should last about six weeks barring complications.

The evidence demonstrated that Mother and the children were bonded. Demus testified that Mother had visited the twins consistently; that the visits were appropriate; that Mother brought food, gifts, and clothing; that the twins and Mother played and interacted well; and that they were bonded. Mother testified,

> G[irl], she's—she's very smart. She's active, talkative. She likes to smile and dance. She likes the little song, "Go, G[irl]. Go, G[irl]" when she does her little dance we have. You know, she's very—I want to say like a little drama queen. When [Boy] does something to her, she'll look at me and just make that little pouting— that little pouting face and expect me to do something.

> [Boy], he's so active and aggressive and just—he always wants to do something. He's a very hungry little boy. He likes to play, but sometimes he's a little rough with his sister, but, you know, he understands, No, [Boy]. Be nice, [Boy]. You know, he understands. They comprehend very well. And just great babies.

Mother testified that the children had not bonded with Father and that they cry with him. But she also said that Girl will let Father hold her. Demus testified that Father visited the children only about five times since January 2013. He went from March 2013 until April 2014 without seeing them at all and was surprised to see them walking in April 2014. The CASA volunteer stated that Father had not participated in the case whatsoever. She testified that he had attended a few visits but "ha[d] been nonconnected with the kids and [had] shown no interest" in them. He told her that he was not going to work his

services, had no intention of doing them, and expected the children to live with his parents.

Demus testified that Mother worked her services sporadically from February 2013 to July 2013, completing none. After TDFPS announced that its goal was termination, though, Mother successfully completed inpatient drug rehab at Pine Street. Father was still unwilling to complete services.

Mother testified that along with completing rehab at Pine Street, she also completed anger management, parenting classes, yoga classes, and an education course for domestic violence and sexual abuse. Mother missed only one of thirteen counseling sessions with her LPC, participated in outpatient drug classes, and provided sign-in sheets to prove her participation in Narcotics Anonymous (NA). Mother also testified that she was taking classes to get her GED. Demus conceded that Mother's services had been substantially completed after she finished her Pine Street rehab.

Mother testified that she had been employed at Estate Maids Cleaning Service for about a month and that she worked at Schlotzky's for seven months before she entered Pine Tree in October 2013. She stated that her hours as a maid vary but that she had last worked twenty-seven hours a week two weeks before trial. She was making $7.25 per hour.

Mother had saved $200 and planned to get her own apartment when she could afford it. At trial, she lived with a friend. Mother admitted that she had lived in at least six places since the children's birth. Mother also had not

11

completed special classes at the hospital for taking care of the fragile twins but planned to complete them after trial. She also did not have a driver's license. But Mother did not want the twins returned to her yet anyway. She testified,

> Right now, I'm trying to work on me and get all of this taken care of as far as housing, driver's license, my schooling. I'm—right now, I want them to be placed with my sister so I can be able to do what I need to do to get them back.

Upon the babies' initial release from the hospital, they had originally lived with paternal aunt, M., who lived with her husband and parents. TDFPS placed the babies with Mother after she had completed about a month of inpatient drug rehab. After TDFPS removed the babies from Mother upon her discharge from VOA Light about a month later, M. would not let the babies live in her home again. She told Hubbard that when the babies lived with her, Mother and Father "came over there, ate her food, talked crazy to her, and didn't really parent the children." The paternal grandparents, Father's choice for raising the children, could not take them because the paternal grandparents lived with M. Hubbard testified that Father and Mother did not suggest any other relative placement possibilities to her near the time of the children's removal from Mother. The babies then went to a foster home.

At the time of trial, the twins had been in the same foster home for ten months, half their lives at that point. They were deliberately placed in a home with a full-time parent because daycare was not appropriate with their medical fragility. In the foster home, Girl thrived, gained weight she needed to gain in

12

order to have the heart surgery, and had been discharged from all ECI and therapy. Boy, on the other hand, was still receiving therapy "maybe nine times out of the month," and there were concerns about his motor skills and his ability to feed himself. Demus testified that in the foster home, the children were on a special diet; they ate organic food and did not eat anything fried, and Girl also drank PediaSure to help her gain weight. Demus testified that the foster parents met the physical, medical, emotional, and financial needs of the children and that she anticipated that the foster parents would also meet those needs in the future. TDFPS's plan was for the parental rights to be terminated and the foster parents to adopt the twins. The foster parents already had a dual license to adopt and wanted to adopt the children. Demus also testified that termination would be in the children's best interest.

Mother's LPC testified that Mom had always named her sister, K., as an ideal candidate for placement. Mother stated that K. had not realized what Mother was up to when she dropped Mother off at the store instead of taking her back to VOA Light rehab after the January 2013 family group conference. Mother also stated that K. had visited with the twins often, had bonded with them, and had bought clothes, diapers, and food for them.

Unlike Mother, Demus did not believe that the children should be placed with maternal aunt K. because she had not yet gained stability and because of Girl's medical issue. K. had been in a relationship with T., her fiancé, for a year at trial but had been in a relationship with someone else and pregnant before

13

that; she miscarried less than a year before trial. Further, K. had not lived in one place for more than a year after leaving her parents' home, T. had been at his current job for only a few months, and K. did not know how to spell the street she said she lived on. If the children were placed with them, Demus worried that they would all be relying on T.'s income from his relatively new job. K. did not provide TDFPS with her plan for raising the children.

Demus had not met K. until the day of trial. K. did not attend the November 25, 2013 family group conference. According to Demus, K. had visited the children only about three times during their almost eighteen months in care. According to the CASA volunteer, T. had not met the children at all.

K. testified that she did not volunteer to raise the twins earlier in the case because she was not stable enough but that she was ready at trial and had some savings. She had arranged to take four months off work to take care of Girl after her surgery. K. testified that she was committed to raising the twins regardless of termination and that T. was also committed and pushed her to do it. K. was already first-aid certified, CPR-certified, and certified with oxygen. She testified that she was willing to protect the babies from their birth parents and call the police if necessary. She testified that she went to the January 2013 family group conference but was not told about any others.

There was evidence that K. and T. would have support from family, friends, and church members if the twins were placed with them and that those people believed that the young couple was mature enough and responsible enough to

14

raise the children. The couple had known each other seven years, and both were active in working with youth at their church.

The CASA volunteer, like Demus, supported termination of both parents' rights and placement with the foster parents. She testified that K.'s current job was also less than a year old and that the year before trial, K. lived with relatives after losing her apartment because of financial trouble. The CASA volunteer conceded that K. already had some "clothes and stuff" for the children but had only one bed and one playpen, not two beds. The trial court heard conflicting evidence about whether K. denied to the CASA volunteer that Mother was still on drugs.

Applying the appropriate standards of review, we hold that the evidence is legally[11] and factually[12] sufficient to support the trial court's best-interest findings against Father and Mother. We overrule the remainder of Father's first two issues, and we overrule Mother's third issue.

---

[11]*See In re E.C.R.*, 402 S.W.3d 239, 249–50 (Tex. 2013); *E.N.C.*, 384 S.W.3d at 807–08; *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *J.P.B.*, 180 S.W.3d at 573–74; *C.H.*, 89 S.W.3d at 27–28; *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

[12]*See A.B.*, 437 S.W.3d at 500; *E.C.R.*, 402 S.W.3d at 249–50; *E.N.C.*, 384 S.W.3d at 807–08; *R.R.*, 209 S.W.3d at 116; *H.R.M.*, 209 S.W.3d at 108; *C.H.*, 89 S.W.3d at 27–28; *Holley*, 544 S.W.2d at 371–72.

**Admission of Exhibits Harmless**

In Father's third issue, he contends that the trial court abused its discretion by admitting Petitioner's Exhibits 13–15 relating to his criminal history dating back more than ten years before trial. But some of this information came in through Mother's testimony or through Petitioner's Exhibit 10 without objection. As to the rest, we found the evidence legally and factually sufficient to support the termination of Father's rights without relying on it. Accordingly, we hold that even if the trial court abused its discretion by admitting the challenged exhibits, any error was harmless.[13] We overrule Father's third issue.

**Conclusion**

Having overruled Father's three issues and Mother's three issues, we affirm the trial court's judgment.

PER CURIAM

PANEL: DAUPHINOT, J.; LIVINGSTON, C.J.; and GABRIEL, J.

DELIVERED: March 19, 2015

---

[13]*See* Tex. R. App. 44.1(a); *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 136 (Tex. 2012); *Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 871 (Tex. 2008); *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001) (op. on reh'g); *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753–54 (Tex. 1995).